AGEE, Circuit Judge:
SD3, LLC and its subsidiary, SawStop, LLC (together, “SawStop”), contend that several major table-saw manufacturers conspired to boycott SawStop’s safety technology and corrupt a private safety-standard-setting process, all with the aim of keeping that technology off the market. Consequently, SawStop sued nearly two dozen saw manufacturers and affiliated entities, alleging that they violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court dismissed SawStop’s amended complaint based on, among other things, its belief that SawStop had failed to plead facts establishing an unlawful agreement. See SDS, LLC v. Black & Decker (U.S.), Inc., No. 11:14-cv-191, 2014 WL 3500674 (E.D.Va. July 15, 2014). SawStop appealed.
We agree with the district court that several parts of SawStop’s case cannot go forward. SawStop’s complaint does not plausibly allege any conspiracy to. manipulate safety standards, so we affirm the district court’s decision to dismiss SawS-top’s claims concerning standard-setting. Likewise, the complaint fails to allege any facts at all against several corporate parents and affiliates, so we affirm the district court’s decision to dismiss all claims against those defendants.
But as to the remaining defendants, SawStop has alleged enough to suggest a plausible agreement to engage in a group boycott. Although that claim may not prove ultimately successful at trial, or even survive summary judgment, the complaint offers enough to survive the defendants’ motion to dismiss. “[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.”[1] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, we vacate the district court’s decision dismissing SawStop’s group-boycott claim .and remand for further proceedings.
I. Background
A. Relevant Facts
This appeal concerns a decision on a motion to dismiss, so we draw the relevant facts only from allegations in SawStop’s complaint and from sources incorporated into that complaint. “In reviewing the dismissal of a complaint, we must assume all well-pled facts to be true and draw all reasonable inferences in favor of the plaintiff.” Cooksey v. Futrell, 721 F.3d 226, 234 (4th Cir.2013). Keeping that standard in mind, we now consider the relevant facts.
1.
In the 1990s, SawStop’s founder, Dr. Stephen Gass, created a form of “active *419 injury mitigation technology” (“AIMT”) meant to prevent some' hand and finger injuries on table saws. In basic terms, Gass’ technology “detects contact between a person and the blade and then stops and retracts the blade to mitigate injury.” J.A. 83 ¶ 60. When this system works as it should, a table-saw user who makes contact with the blade will suffer only a small nick rather than more serious injury.
Gass and his co-inventors initially sought to capitalize on their invention by pursuing licensing agreements with the major table-saw manufacturers. The effort began in August 2000, when SawStop first took a “prototype table saw” to a trade show to publicly demonstrate the technology. J.A. 86 ¶ 66. That demonstration spurred meetings with some table-saw manufacturers, including S-B Power Tool Corp.; Black & Decker (U.S.), Inc.; Emerson Electric Company; and Ryobi Technologies, Inc. J.A. 86 ¶ 67. During these meetings, SawStop sought royalties at “typical commercial rates” of about “8% of wholesale prices” in any license agreement. J.A. 86 ¶ 65.
The technology “impressed” the manufacturers. J.A. 87 ¶ 68. Ryobi, for instance, formed a team to determine whether it could incorporate SawStop’s technology into its products; Ryobi’s counsel wanted to adopt the technology “as fast as they [could].” J.A. 87 ¶ 69. S-B Power Tool likewise expressed interest in “going forward.” J.A. 88 ¶ 73. One Black & Decker U.S. employee told Gass that he felt a licensing agreement was “inevitable,” even though Black & Decker was “used to being able to crush little guys.” J.A. 88 ¶ 76. Emerson’s then-president also held in-person meetings with SawStop to discuss a potential deal. J.A. 88-89 ¶ 77. Several • manufacturers conducted' technical studies to evaluate SawStop’s effectiveness in preventing table-saw accidents, which produced positive results. J.A. 87-88' ¶¶ 70, 74.
Still, table-saw manufacturers also held reservations, one of which was product liability exposure. If some manufacturers adopted AIMT while others did not, then an issue could arise as to whether the non-adopters might be sued for producing an inherently unsafe product. J.A. 90 ¶81. But a lawyer for one defendant noted that the AIMT technology might be deemed infeasible, and therefore less relevant in product-liability suits, if it did not enter the market for some period. J.A. 8788 ¶ 72.
Putting aside product liability, some saw manufacturers held other concerns, including that engineering and cost factors could render the technology infeasible. By all accounts, SawStop had not yet tested its technology in the marketplace. That testing would take some time, and SawStop itself estimated that the device could not have been fully implemented on all table saws until as late as 2008. J.A. 92 ¶ 90. At least one industry insider also believed that SawStop’s AIMT could induce consumers to dispense with other safety features. J.A. 87 ¶ 71. Furthermore, AIMT did not prevent certain other common table-saw injuries, like kickback. Id.
SawStop’s licensing discussions did not produce any immediate results. One manufacturer, S-B Power Tool, ended licensing discussions in September 2001. J.A. 88 ¶ 75.
2.
' In October 2001, table-saw manufacturers allegedly met and “decide[d] how to respond, as an industry, to the SawStop [technology.” J.A. 89 ¶ 80. The meeting occurred in conjunction with the annual meeting of the Power Tool Institute, a trade association. Like the broader annual meeting, the table-saw session drew rep *420 resentatives from across the industry, including S-B Power Tool; Ryobi; Makita USA, Inc.; Emerson; Porter-Cable Corp.; Hitachi Koki USA Ltd.; Black & Decker U.S.; and Milwaukee Electric Tool Corp. J.A. 89 ¶ 79.
SawStop alleges that the October 2001 meeting gave birth to a group boycott against SawStop. The manufacturers first purportedly determined to take an “all” or “nothing” approach, in which all table-saw manufacturers would adopt SawStop’s technology or none would. J.A. 89-90 ¶ 80. Then, they allegedly took the latter path: they “agree[d] not to purchase technology licenses from [SawStop] or otherwise implement AIMT.” J.A. 90 ¶ 80. “[N]o contrary views [were] articulated.” Id. By keeping SawStop out of the market, the manufacturers hoped that “it would remain ... at least plausible for [them] to contend, in defending product liability lawsuits, that AIMT was not viable.” J.A. 90 ¶ 81.
Ultimately, SawStop contends, the group boycott succeeded.- “[T]hose Defendants not yet in license negotiations with SawStop refrained from requesting a license, [while] Defendants who were already in negotiations found ways to abort them as opportunities arose.” J.A. 91 ¶ 85.
According to the complaint, it took only a matter of months for the few defendants who had been negotiating with SawStop to find ways to end those discussions. In January 2002, for instance, Ryobi had agreed to a non-exclusive licensing agreement with an initial 3% royalty and a 5% to 8% escalator clause. J.A. 91-92 ¶87. SawStop, however, identified a “minor ambiguity” in the agreement and asked Ryobi to correct the “error.” J.A. 92 ¶ 87. Although Ryobi’s counsel assured SawStop that would happen, Ryobi instead ended negotiations entirely; Ryobi stopped responding to SawStop’s communications, and never explained its failure to communicate further. Id Similarly, Emerson abruptly ended negotiations, “offering pre-textual reasons for its lack of interest.” J.A. 92 ¶88. And Black & Decker U.S. offered a “disingenuous and not made in good faith” offer: a 1% royalty, paired with an indemnification provision that would have placed liability on SawStop for “various risks.” J.A. 92 ¶ 89.
3.
Having failed to sign any manufacturer to a licensing agreement, SawStop turned to a private safety-standard-setting organization, Underwriters Laboratories, Inc. (“UL”), to advance the AIMT product. In December 2002, Gass submitted a proposal to UL suggesting that the organization modify its widely accepted safety standards to require AIMT on all table saws. J.A. 96 ¶ 104. UL in turn referred the proposal to Standards Technical Panel 745 (“STP 745”), a subgroup of UL that sets standards for table saws. J.A. 96 ¶ 104.
SawStop’s proposal to modify the UL standards failed, and SawStop alleges that the failure traces to a second conspiracy, which we will term the “standard-rejection conspiracy.” In SawStop’s view, STP 745 was “under the firm control of the Defendants,” as its members comprised “either employees of the Defendants or ... purportedly unaffiliated consultants ... who are aligned with the Defendants.” J.A. 97 ¶ 106. Thus, the defendants allegedly “agreed to vote as a bloc” to “thwart” the proposal. J.A. 97 ¶ 105. After the vote, the defendants are said to have “promulgated falsehoods, factual distortions and product defamation” to ensure that STP 745 would not adopt any standard incorporating AIMT. J.A. 101 ¶ 123.
*421 4.
Later, the defendants are alleged to have additionally conspired to develop their own safety standards, purportedly to impose unnecessary costs on SawStop and foreclose any wide adoption of AIMT. SawStop says that the defendants implemented this conspiracy in multiple stages. First, in October 2003, several defendants — Black & Decker Corp.; Hitachi; Pentair, Inc.; Robert Bosch Tool Corp.; Robert Bosch GmbH; Ryobi; One World Technologies Inc.; and Techtronics Industries Co., Ltd. — formed a joint venture to develop blade avoidance technology. J.A. 97 ¶ 109. SawStop maintains that this venture was a mere “smokescreen” to “fend off” intervention from the Consumer Products Safety Commission, a federal safety agency, and constituted an “act of fraudulent concealment.” Id. The venture failed to produce any results. Later, in November 2004, four defendants — Black & Decker Corp., Makita USA, Robert Bosch Tool Corp., and Techtronic Industries North America — formed another joint venture. J.A. 98 ¶ 111. This venture, too, was alleged to be a fake effort “to develop a uniform blade guard standard to preclude quality competition on blade guard standards.” Id. Members of the Power Tool Institute also began work on a new blade guard design around the same time.
This third conspiracy, which we will call the “contrived-standards conspiracy,” led to two standards changes adopted by UL in 2005 and 2007. The first change added certain anti-kickback devices. The second “specified that the blade guard should not be a hood, but rather a modular design with a top-barrier element and two side-barrier guarding elements.” J.A. 99 ¶ 115. SawStop maintains that this second change is too designed-focused and ineffective; it deduces that the change must therefore serve an illegitimate purpose.
SawStop further believes that the manufacturers are trying to extend the contrived-standards conspiracy abroad, as they “control” the International Electro-' technical Commission, the European counterpart to UL. J.A. 100 ¶ 122.
5.
SawStop maintains that all of the alleged conspiracies have continued through today, and the defendants purportedly communicate weekly “to maintain” the conspiracies. J.A. 100 ¶ 121. Nonetheless, SawStop was eventually able to enter the market by making its own table saws employing AIMT in 2004. J.A. 95 ¶ 101. When SawStop filed its complaint, it sold three types of these saws. J.A. 95-96 ¶ 102. The company represented at oral argument that it now makes additional models.
B. Proceedings Below
Based on the three purported conspiracies, SawStop filed a complaint in February 2014 in the U.S. District Court for the Eastern District of Virginia. The original three-count complaint against 22 separate defendants alleged that the manufacturer-defendants, conspiring with UL and the Power Tool Institute, violated § 1 of the Sherman Act. After the defendants moved to dismiss, however, SawStop filed a first amended complaint — the operative pleading on appeal — dropping some defendants and adding three new counts under state law. For convenience, we refer to the first amended complaint as simply “the complaint.”
The district court dismissed SawStop’s complaint under Federal Rule of Civil Procedure 12(b)(6) after identifying a number of problems that it perceived in the facts alleged. First, “Plaintiffs’ conspiracy allegations [were] belied by their negotiating history with varying Defen *422 dants.” SDS, LLC, 2014 WL 3500674, at *3. In the district court’s view, SawStop could not plausibly allege a refusal to deal when several defendants had actually offered to deal, and the facts alleged did not “tend[] to exclude” lawful explanations. Id. at *4. Second, SawStop failed to allege anything as to several defendants, instead choosing to lump them together in the complaint without explanation. Id. Third, SawStop did not allege “direct evidence” of agreement by referring to testimony from a Ryobi engineer, David Peot. The district court found that Peot’s testimony, when read in its full context, indicated only that certain defendants launched a joint venture to develop technology to prevent table-saw accidents. Id. at *5. Fourth, SawStop had not established any harm from any of its alleged conspiracies because the “purported motivation for the alleged conspiracy is nonexistent.” Id. And fifth, SawStop’s standard-setting conspiracies alleged nothing more than ordinary participation in trade groups, standard-setting organizations, and joint ventures, which does not create antitrust liability. Id. at *6.
SawStop timely appealed, challenging the district court’s decision as to its three Sherman Act claims. SawStop does not address the district court’s decision to dismiss its three remaining state law claims. As to those claims, SawStop has forfeited review, and we do not consider them. See Powell v. Palisades Acquisition XVI, LLC, 782 F.3d 119, 127 (4th Cir.2014). We have jurisdiction under 28 U.S.C. § 1291.
II. Standard of Review
‘We review the district court’s grant of the defendants’ motion to dismiss de novo.” Johnson v. Am. Towers, LLC, 781 F.3d 693, 706 (4th Cir.2015). “[W]e accept as true all well-pled facts in the complaint and construe them in the light most favorable to [SawStop].” United .States v. Triple Canopy, Inc., 775 F.3d 628, 632 n. 1 (4th Cir.2015). We do not, however, “accept as true a legal conclusion couched as a factual allegation.” Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir.2014). Nor do we accept “unwarranted inferences, unreasonable conclusions, or arguments.” United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir.2014). We can further put aside any “naked assertions devoid of further factual enhancement.” Id.
III. Allegations Against Parents and Affiliates
We begin by addressing a problem common to all counts of the complaint.
A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group. At trial, a § 1 plaintiff will be required to make a “factual showing that each defendant conspired in violation of the antitrust laws.” AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 234 (2d Cir.1999); cf. United States v. Foley, 598 F.2d 1323, 1336 (4th Cir.1979) (examining whether a jury charge in a criminal antitrust case “require[d] a sufficient involvement by each defendant”). Thus, the complaint must forecast that factual showing, and if it fails to allege particular facts against a particular defendant, then the defendant must be dismissed. In other words, the complaint must “specify how these defendants [were] involved in the alleged conspiracy,” without relying on “indeterminate assertions” against all “defendants.” In re Travel Agent Comm’n Antitrust Litig., 583 F.3d 896, 905 (6th Cir.2009); see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 436 (6th Cir.2008); *423 In re Elevator Antitrust Litig., 502 F.3d 47, 50-51 (2d Cir.2007).
Nevertheless, SawStop means to bring claims against some corporate parents — including Hitachi Koki Co., Ltd.; Makita Corporation; Chang Type Industrial Co., Ltd.; and Teehtronic Industries Co., Ltd. — even though no factual allegations are made against them. Instead, SawStop nakedly alleges only that all of the corporate subsidiaries are “dominated by, and [are] alter ego[s] of,” these corporate parents. J.A. 73-78. That allegation offers only a legal conclusion, and SawStop has alleged no facts suggesting the kind of unity of interests that we usually require a party to plead before permitting them to advance an alter ego theory. See, e.g., C.F. Trust, Inc. v. First Flight Ltd. P’ship, 306 F.3d 126, 134 (4th Cir.2002). “The fact that two separate legal entities may have a corporate affiliation does not alter [the] pleading requirement” to separately identify each .defendant’s pleading requirement to separately identify each defendant’s Antitrust Litig., No. 13-md-2481 (KBF), 2015 WL 1344429, at *2 (S.D.N.Y. Mar. 23, 2015).
The complaint also fails to allege any facts pertaining to certain of the corporate subsidiaries. In discussing the alleged group boycott, for example, SawStop never mentions Teehtronic Industries North America, Inc.; OWT Industries, Inc.; or Pentair Water Group, Inc. OWT Industries, Inc. and Pentair Water Group also go unmentioned in SawStop’s allegations as to the UL safety standards. A defendant obviously may not pursue an antitrust claim against a defendant who is not alleged to have done anything at all. Antitrust law doesn’t recognize guilt by mere association, imputing corporate liability to any affiliate company unlucky enough to be a bystander to its sister company’s alleged misdeeds.
SawStop tries to tie other defendants to the purported conspiracies with nothing more than conclusory statements, even though those defendants entered the table-saw industry well after these conspiracies allegedly began. Stanley Black & Decker, Inc., for instance, is purportedly liable because “persons speaking for [the company] have affirmed its understanding of the purpose of [the conspiracies], and agreed to participate in [them].” J.A. 99 ¶ 117. SawStop alleges the same as to Delta Power Equipment, Inc. J.A. 99 ¶ 116. “[U]na-dorned conclusory allegations” like these are akin to no allegations at all. Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir.2013).
For these reasons, SawStop cannot proceed against all of the defendants. In particular, Hitachi Koki Co., Ltd.; Makita Corporation; Chang Type Industrial Co., Ltd.; OWT Industries, Inc.; Pentair Water Group, Inc.; Stanley Black & Decker, Inc.; and Delta Power Equipment, Inc. must be dismissed as to all counts. The group-boycott claims against Teehtronic Industries North America, Inc. and Teeh-tronic Industries Co., Ltd. must also be dismissed. The district court correctly dismissed these defendants because, at least as to them, the “complaint was vague, never explained its case, and lumped [them] together without sufficient detail.” Bates v. City of Chicago, 726 F.3d 951, 958 (7th Cir.2013).
We now consider whether SawStop has properly alleged an antitrust conspiracy against the remaining manufacturers.
IV. Pleading a § 1 Conspiracy
Section 1 of the Sherman Antitrust Act prohibits “[e]very contract, combination ..., or conspiracy in restraint of trade.” 15 U.S.C. § 1. “To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint *424 of trade.” N.C. State Bd. of Dental Exam’rs v. FTC, 717 F.3d 359, 371 (4th Cir.2013).
This appeal principally concerns the first element, the conspiracy. “[Section one’s prohibition against restraint of trade applies only to concerted action, which requires evidence of a relationship between at least two legally distinct persons or entities.” Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, 284 (4th Cir.2012). To be actionable, the defendants must have specifically made a “conscious commitment to a common scheme designed to achieve an unlawful objective.” Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Not even “conscious parallelism” is enough, Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), as “independent action is not proscribed by § 1,” Va. Vermiculite, Ltd. v. Historic Green Springs, Inc., 307 F.3d 277, 280 (4th Cir.2002).
Accordingly, a plaintiff bringing a § 1 claim must first plead an agreement to restrain trade. In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that such a plaintiff must plead “enough factual matter (taken as true) to suggest that [the requisite] agreement was made.” In other words, the complaint must contain “enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.” Id. For this reason, “allegations of parallel conduct [on the part of the defendants] ... must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.” Id. at 557, 127 S.Ct. 1955. “[A] conclusory allegation of agreement at some unidentified point [also] does not supply facts adequate to show illegality.” Id.
At bottom, Twombly applies a long-held principle in antitrust law to the pleading stage: parallel conduct, standing alone, does not establish the required agreement because it is equally consistent with lawful conduct. The Twombly plaintiffs asked the Court to reject that idea and assume a conspiracy “exclusively” from action that seemed too coincidentally similar to be independent. Id. at 565 n. 11, 127 S.Ct. 1955. The Court refused, and for good reason. “Parallel conduct or interdependence,” after all, is “just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.” Id. at 554, 127 S.Ct. 1955. Thus, the complaint in Twombly failed because it rested only on “descriptions of parallel conduct” that could be just as easily explained by “natural, unilateral reaction[s]” from each defendant. Id. at 564, 566, 127 S.Ct. 1955; see also Robertson, 679 F.3d at 289 (“Twombly required contextual evidence to substantiate a speculative claim about the existence and substance of a conspiracy.”).
For a § 1 claim to survive, then, a plaintiff must plead parallel conduct, and something “more.” Twombly, 550 U.S. at 557, 127 S.Ct. 1955. That “more” must consist of “further circumstance[s] pointing toward a meeting of the minds.” Id. Allegations could suffice, for instance, where a plaintiff demonstrates that the parallel behavior “would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.” Id. at 556 n. 4, 127 S.Ct. 1955. Often “characterized as ‘parallel plus’ or ‘plus factors,’ ” Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 45 (1st Cir.2013), these facts must be evaluated holistically, see *425 Cont’l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (cautioning courts not to “compartmentaliz[e] the various factual components” of an antitrust case).
We do not take the approach that the dissent pursues, which seems to parse each “plus factor” individually and ask whether that factor, standing alone, would be sufficient to provide the “more.” Cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (explaining that “courts must consider the complaint in its entirety” to determine whether “all of the facts alleged, taken collectively,” give rise to relevant inferences, rather than asking “whether any individual allegation, scrutinized in isolation, meets that standard”). Actions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances. See William E. Kovaeic, et al., Plus Factors and Agreement in Antitrust Law, 110 Mich. L.Rev. 393, 426-34 (2011) (explaining why plus factors must be analyzed in groups or “constellations”).
Importantly, Twombly’s requirement to plead something “more” than parallel conduct does not impose a probability standard at the motion-to-dismiss stage. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Courts must be careful, then, not to subject the complaint’s allegations to the familiar “preponderance of the evidence” standard. Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir.2010). When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint. But it is not our task at the motion-to-dismiss stage to determine “whether a lawful alternative explanation appear[s] more likely” from the facts of the complaint. Houck v. Substitute Tr. Servs., Inc., 791 F.3d 473, 484 (4th Cir.2015). Posh-Twombly appellate courts have often been called upon to correct district courts that mistakenly engaged in this sort of premature weighing exercise in antitrust cases. See, e.g., Evergreen Partnering Grp., 720 F.3d at 50; Erie Cnty., Ohio v. Morton Salt, Inc., 702 F.3d 860, 868-69 (6th Cir.2012); Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 189 (2d Cir.2012).
Similarly, courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage. At summary judgment in a § 1 case, a plaintiff must summon “evidence tending to exclude the possibility of independent action.” Twombly, 550 U.S. at 554, 127 S.Ct. 1955; see also Monsanto, 465 U.S. at 764, 104 S.Ct. 1464; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). But the motion-to-dismiss stage concerns an “antecedent question,” Twombly, 550 U.S. at 554, 127 S.Ct. 1955, and “[t]he ‘plausibly suggesting’ threshold for a conspiracy complaint remains considerably less than the ‘tends to rule out the possibility’ standard for summary judgment,” Starr v. Sony BMG Music Entm’t, 592 F.3d 314, 325 (2d Cir.2010). Thus, “[a]l-though Twombly’s articulation of the pleading standard for § 1 cases draws from summary judgment jurisprudence, the standards applicable to Rule 12(b)(6) and Rule 56 motions remain distinct.” In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 323 n. 21 (3d Cir.2010). “[T]here is no authority ... for extending the [Monsanto/Matsushita] standard to the pleading stage.” Erie Cnty., 702 F.3d at 869. Indeed, such an extension would be wholly unrealistic, as “a plaintiff may only have so much information at his disposal at the outset.” Robertson, 679 F.3d at 291. *426 Here, for instance, SawStop was three months into its case and had not conducted any discovery when the defendants moved to dismiss. We can hardly expect it to have built its entire case so early on.
We therefore consider whether the district court properly applied this plausibility-focused standard.
V. Group Boycott
SawStop initially alleges a group boycott, which generally constitutes a “concerted refusal[ ] by traders to deal with other traders.” Klor’s, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Most often, group boycotts involve “horizontal agreements among direct competitors” with the aim of injuring a rival. NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). This sort of “naked concerted refusal occurs when the defendants are not engaged in any significant integration of production or distribution, and the only rationale for the restraint is the elimination of additional, lower-cost, higher-quality, or more innovative output from the market.” Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 22.02a (4th ed.2014 supp.). “[S]uch agreements ... cripple the freedom of traders and thereby restrain their ability to sell in accordance with, their own judgment.” Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951).
A.
The district court held that SawStop had not adequately alleged an agreement to boycott. However, in reaching that conclusion, the district court committed the two errors that we earlier cautioned against.
First, it confused the motion-to-dismiss standard with the standard for summary judgment. The district court twice cited Matsushita — the case defining the “tends to exclude” standard for summary judgment — as a basis for its ruling. See SD3, LLC, 2014 WL 3500674, at *3, *4. It then mistakenly dismissed certain claims because the facts alleged did not “tend[ ] to exclude” independent action. Id. at *4. It made explicit findings of fact — including a finding that motive was “nonexistent”— that were plainly contradicted by the terms of the complaint. See J.A. 89-90 ¶¶ 80-81 (alleging motive). The district court further required SawStop to definitively “show an agreement,” SD3, LLC, 2014 WL 3500674, at *3, rather than asking whether the allegations “plausibly suggested]” such an agreement, Twombly, 550 U.S. at 557, 127 S.Ct. 1955. And it erroneously looked to summary judgment cases to define the relevant standards. See, e.g., SD3, LLC, 2014 WL 3500674, at *3 (citing Gtr. Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 396 (7th Cir.1993)).
Second, the district court applied a standard much closer to probability than plausibility. For instance, the district court’s opinion adopts defendants’ characterizations of the licensing negotiations and then draws unsurprisingly adverse inferences against SawStop based on them. The district court noted, for example, that Emerson had made a pre-conspiracy offer to license, but believed that SawStop had made “no allegation that Emerson rescinded that offer.” SD3, LLC, 2014 WL 3500674, at *4. SawStop specifically alleged to the contrary that “Emerson cut off all license negotiations with SawStop, offering pretextual reasons for its lack of interest, and did not renew them.” J.A. 92 ¶ 88. In much the same way, it concluded that a “disingenuous” offer to license from Black & Decker USA was inconsistent with conspiracy, SD3, LLC, 2014 WL *427 3500674, at *4, without explaining why an offer that SawStop pled was intended to be rejected was unavoidably inconsistent with a refusal to license. On the whole, these inferences seem to have been colored by the district court’s belief that SawStop was “a technology with uncertain commercial viability and safety.” Id. at *5.
In short, the district court imposed a heightened pleading requirement — but such a standard does not apply on a Rule 12(b)(6) motion, even in an antitrust case. See Marucci Sports, L.L.C. v. Nat'l Collegiate Ath. Ass’n, 751 F.3d 368, 373 (4th Cir.2014); W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir.2010). This heightened pleading standard was error. Instead, the district court should have asked whether SawStop has alleged parallel action and something “more” that indicates agreement, as Twombly provides.
Our de novo standard of review means that we can decide the matter without deference to the lower court. Thus, we may apply the appropriate, Twombly-based standard ourselves rather than remanding to the district court for another attempt of its own. See, e.g., Houck, 791 F.3d at 484-86; Triple Canopy, 775 F.3d at 637-40. Further, we enjoy the benefit of the parties’ briefs, and can read and understand the complaint in the same way as could the district court. Thus, we proceed to consider whether SawStop has adequately alleged a group boycott.
B.
A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted “similarly.” Petruzzi’s IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1243 (3d Cir.1993); see also Hyland v. HomeServices of Am., Inc., 771 F.3d 310, 320 (6th Cir.2014) (considering whether the defendants’ actions were “uniform”).
SawStop adequately alleged parallel conduct. The similar or uniform actions alleged are obvious: none of the defendants ultimately took a license or otherwise implemented SawStop’s technology. As a result, SawStop could not pursue its initial business strategy of entering the market through a license agreement with a major table-saw manufacturer. Such actions are classically anticompetitive, as “parallel action that excludes new entrants both facilitates price elevation and can slow innovation.” C. Scott Hemphill & Tim Wu, Price Exclusion, 122 Yale L.J. 1182, 1185 (2013).
The manufacturers incorrectly insist that their conduct must be deemed dissimilar at this stage because some licensing negotiations continued after the conspiracy formed. The district court agreed. See SD3, LLC, 2014 WL 3500674, at *4 (“The sequence of all of these events undermines the Plaintiffs’ group boycott allegations.”). So does the dissent.
But that argument misunderstands the nature of the alleged boycott, while again confusing “probability” with “plausibility.” The manufacturers could have achieved their alleged objective of keeping SawStop off the market in any number of ways: they could refuse any licensing discussions at all, they could engage in spurious licensing discussions, see, e.g., J.A. 93 ¶ 94, they could sign a license agreement and then never implement it, or they could scare SawStop off with commercially unreasonable offers. All of these actions could be consistent with the boycott’s ultimate alleged objective, exclusion from the marketplace. See Evergreen Partnering Grp., 720 F.3d at 51 (faulting the district court for “improperly weighting] [the] defendants’ allegedly] inconsistent responses”); Anderson News, 680 F.3d at 191 (holding *428 that defendants’ “varied” actions during the initial stages of the alleged conspiracy did not render the existence of a conspiracy implausible).
SawStop never alleged that the manufacturers agreed on a common manner of preventing SawStop’s entry into the market. That’s not surprising. Commercially sophisticated parties like the defendants could well understand the red flags that would be raised from a blanket, total refusal to negotiate. See, e.g., Am. Tobacco Co. v. United States, 328 U.S. 781, 800-01, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (detailing a price-fixing conspiracy in which the defendants used a variety of differing methods to achieve the same ultimate objective, an understood and settled price for tobacco). SawStop might have become suspicious if all of the defendants fled the negotiations en masse without any pretex-tual cover. But if the defendants employed different courses of action, then their conspiracy might better avoid detection. SawStop alleges they did exactly that. See J.A. 94 ¶ 96 (“Defendants fraudulently concealed the AIMT Boycott by, among other things, giving separate excuses for not taking a licensef.]”); J.A. 95 ¶ 100 (“[SawStop]’s inquiries were met with silence, false denials ... and misleading explanations!)]”).
The dissent, however, is unwilling to credit SawStop’s factual allegation' that the different paths of negotiations were themselves part of the claimed conspiratorial ruse. It contends that, in crediting SawStop’s allegation, we “underestimate[ ] the difficulty of getting a group of competitors to agree on a course of action that separate contract negotiations may or may not have shown to be in their best commercial interest.” Dissenting op. at 450. But the same thing could be said about most any alleged agreement between competing businesses — and yet the law has never embraced a presumption against business agreements. Much of antitrust law is premised on such agreements. More importantly, we are in no position at this stage to make “estimates” of the sort the dissent posits. It should hardly need to be said again that we must proceed “on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Twombly, 550 U.S. at 555, 127 S.Ct. 1955. “Rule 12(b)(6) does not countenance dismissals based on a judge’s disbelief of a complaint’s factual allegations.” Colon Health Ctrs. of Am., LLC v. Hazel, 733 F.3d 535, 545 (4th Cir.2013).
We must be careful not to rely on our own subjective disbelief here, as even the acts that the manufacturers and the dissent say are dissimilar might also be read to suggest deception. Ryobi and Emerson, for example, suddenly ended negotiations without sufficient explanation after proceeding all the way to a draft license agreement. See J.A. 92 ¶¶ 77, 87-88. This sort of abrupt and unexplained shift in behavior can suggest that a defendant’s acts were not entirely independent, as the shift came after the alleged October 2001 agreement to launch the boycott. See, e.g., Toys “R” Us, Inc. v. FTC, 221 F.3d 928, 935 (7th Cir.2000) (explaining that the defendants’ sudden “decision to stop dealing,” which was an “abrupt shift from the past,” provided more reason to infer a horizontal agreement). For its part, Black & Decker USA purportedly tendered only a “disingenuous” offer that was “not made in good faith.” J.A. 92 ¶ 89. Assuming that characterization is accurate (as we must), few benign purposes would be served by such an offer.
But the dissent would require more, even at this early stage of the proceedings; it would find “parallel conduct” only when defendants move in relative lockstep, achieving their common anticompetitive *429 ends (exclusion) only by substantially identical means. So far as we can tell, this standard finds no support in any existing authority.
The three decisions that the dissent cites do not support the proposed rule,- as they all involved non-parallel “ends.” One involved inconsistent pricing in an alleged price-fixing conspiracy, see City of Moundridge v. Exxon Mobil Corp., 429 F.Supp.2d 117, 131-32 (D.D.C.2006), while another addressed wildly varying surcharges (in both amount and timing) in an alleged fuel-surcharge-fixing conspiracy, LaFlamme v. Societe Air France, 702 F.Supp.2d 136, 151 (E.D.N.Y.2010). The last, an appeal from a summary judgment decision, held only that the defendant had not established conscious parallelism on the part of one defendant; it assumed, however, that the actions alleged were parallel. See Cosmetic Gallery, Inc. v. Sehoeneman Corp., 495 F.3d 46, 54 (3d Cir.2007). At best, these cases stand for an unremarkable proposition: parallel conduct must produce parallel results. And they further recognize the very point so hotly contested by the dissent: parallel conduct “need not be exactly simultaneous and identical in order to give rise to an inference of agreement.” LaFlamme, 702 F.Supp.2d at 151; cf. City of Moundridge v. Exxon Mobil Corp., Civil Action No. 04-940(RWR), 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) (“Price-fixing can occur even though the price increases are not identical in absolute or relative terms.”).
Our own precedent does not support the dissent’s view. Take, for example, United States v. Foley, 598 F.2d 1323 (4th Cir.1979), in which a group of real estate brokers were convicted of violating § 1 by conspiring to fix real estate commissions. It seems an understatement to say that the Foley defendants did not move in any way close to perfect tandem: some defendants did not act to implement the commission-fixing agreement until months after it formed, while at least one defendant implemented the new commissions before the conspiracy formed. Id. at 1332-34. Still other defendants only “partially” joined, taking higher commissions when available but otherwise pursuing lower ones. Id. Had Foley been decided under the dissent’s framework, these “divergent paths to the same end” (higher commissions) would apparently have required reversal of the convictions. The Court, however, reached a different result — it affirmed all nine criminal convictions after finding sufficient evidence of agreement. Id. at 1335. Foley, then, effectively rejects the dissent’s proposed methodology.
Lastly, we disagree that the dissent’s definition is needed to avoid imposing antitrust liability on innocent activities. The dissent proceeds as if a finding of parallel conduct inexorably leads to liability. But Twombly’s foundational principle is that parallel conduct, standing alone, is not enough to impose antitrust liability. In other words,' the plaintiffs initial showing of parallel conduct is only an initial step in a multi-step process. It is the additional steps required of an antitrust plaintiff that are meant to ensure that .innocent business activities are not tarred as antitrust violations, whether at the motion-to-dismiss stage or later.
Thus, we think it plain that SawStop alleged parallel conduct. The remaining question is whether SawStop also pleads the requisite “more” that “point[s] toward a meeting of the minds.” Twombly, 550 U.S. at 557, 127 S.Ct. 1955.
C.
SawStop has alleged the “more” necessary to move its allegations of parallel conduct into the realm of plausibility.
*430 The group-boycott claim pled in the complaint builds a detailed story. SawS-top identifies the particular time, place, and manner in which the boycott initially formed, describing a separate meeting held for that purpose during the Power Tool Institute’s October 2001 annual meeting. See J.A. 89-90 ¶¶ 7981. The complaint names at least six specific individuals who took part in forming the boycott, noting which defendant each person ostensibly represented. See J.A. 89 ¶¶ 78-79. The complaint further tells us the means by which the defendants sealed their boycott agreement: a majority vote. See J.A. 89 ¶ 80. And the complaint then explains how the manufacturers implemented the boycott: refusing to respond to entreaties from SawStop, going silent after long negotiations, or offering only bad-faith terms that were intended to be rejected. Thus, “[u]nlike the plaintiffs in Twombly ..., [SawStop] clearly has alleged an express agreement to restrain trade.” Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 457 (6th Cir.2011); cf. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (explaining that a Title VII complaint should not have been dismissed where it “detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination”).
Antitrust complaints, like SawS-top’s, “that include detailed fact allegations as to the ‘who, what, when and where’ of the claimed antitrust misconduct not surprisingly survive dismissal.” William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 9:14 (2014 supp.); see also Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 445 (6th Cir.2012); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1048 (9th Cir.2008); cf. Goldfarb v. Mayor & City Council of Balt., 791 F.3d 500, 511 (4th Cir.2015) (“A complaint should not be dismissed as long as it provides sufficient detail about the claim to show that the plaintiff has a more-than-conceivable chance of success on the merits.”). Detail in a complaint of “further circumstances pointing toward a meeting of the minds” allays The suspicion that the plaintiff is merely speculating a conspiracy into existence from coincidentally similar action. Twombly, 550 U.S. at 557, 127 S.Ct. 1955. That, after all, was Twombly’s principal concern. See Swanson v. Citibank, N.A., 614 F.3d 400, 405 (7th Cir.2010) (“A more complex case [like one] involving ... antitrust violations[ ] will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiffs mind at least, the dots should be connected.”).
The dissent contends that the complaint rests on a “casual presumption” of liability. But that view overlooks the complaint’s detailed account of the alleged events — an account that, again, we must take as true for Rule 12(b)(6) purposes. Instead, the dissent seems to rely on a series of factual suppositions that might “perhaps” explain the relevant parallel conduct. But that approach forces us to ignore the factual allegations that form the heart of SawS-top’s complaint: a particular meeting on a particular day with particular participants making a particular agreement that generated the conspiracy at issue. And by favoring its perception of the relevant events over the narrative offered by the complaint, the dissent makes the very mistake that the district court made, recasting “plausibility” into “probability.”
The dissent underscores the weakness in its position by mischaracteriz-ing the factual allegations in SawStop’s complaint as “conelusory” in an effort to avoid them. It may be that the dissent *431 doesn’t believe the complaint’s detailed allegations, but that skepticism does not render the allegations “conclusory.” See Iqbal, 556 U.S. at 681, 129 S.Ct. 1937 (explaining allegations cannot be called “con-clusory” merely because a judge views them as “extravagantly fanciful,” “unrealistic,” or “nonsensical”). Indeed, just two weeks after Twombly, the Supreme Court reversed one of our sister circuits for making much the same error. See Erickson v. Pardus, 551 U.S. 89, 90, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (reversing dismissal of a complaint as “conclusory” where the complaint alleged harm only by saying that prison officials “endanger[ed] his life” by taking away needed treatment). And, as a practical matter, demanding more than the particularized allegations that SawStop offered here would compel an antitrust plaintiff to plead evidence — and we have already expressly refused to impose such a requirement. See Robertson, 679 F.3d at 291.
In any event, we observe that SawStop not only alleges the “who, what, when, and where” in its complaint, but also the “why.” “[Mjotivation for common action” is a key circumstantial fact. Einer R. Elhauge & Damien Geradin, Global Antitrust Law and Economics 837 (2007); see also Hyland, 771 F.3d at 320 (listing “common motive to conspire” as a potential plus factor); Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir.2013) (same). According to the complaint, the defendants here were motivated to conspire out of a fear of product-liability exposure: if one manufacturer adopted the technology, then non-adopting manufacturers could face liability exposure from their failure to employ AIMT. Thus, under SawStop’s theory, the manufacturers conceived a group boycott to keep AIMT off the market, thereby preventing its use as a design alternative in product-liability cases. And even though a complaint need not “forecast evidence” to support its theory, Robertson, 679 F.3d at 291, SawStop’s complaint does so by referencing testimony from Peot (the former Ryobi engineer), who agrees that non-adopting manufacturers “could” have been in “real legal trouble” if a major manufacturer had adopted AIMT. Transcript of Trial at 4-125, Osorio v. One World Techs., Inc., No. 06-CV-10725, 2010 WL 5547271 (D.Mass. Feb. 25, 2010), ECF No. 137 (cited at J.A. 89 ¶ 80). The complaint further describes statements in which Black & Decker’s counsel is alleged to have said that product liability could be lessened “if a couple of years passed without implementation of the SawStop [tjechnology.” J.A. 87 ¶ 72.
The defendants insist that this alleged motive is implausible, and the dissent agrees. They theorize that, if SawStop’s theory of motive were true, one would have expected all of the manufacturers to take a license once SawStop began making its own AIMT-equipped saws in 2004. The complaint indicates that course of events did not occur.
Once more, the manufacturers’ argument — embraced by the dissent — seems to misconstrue the complaint’s allegations. SawStop entered the market as a peripheral player. See Appellant’s Br. 44 (“SawStop’s sales ... did not even constitute 1% of total industry sales of table saws in the United States[.]”). Thus, the manufacturers were still conceptually able to argue that SawStop was peddling a fringe technology, as reflected in its “mar-ginaliz[ed]” market position. See J.A. 90 ¶ 81; see, e.g., Osorio v. One World Techs., Inc., 659 F.3d 81, 87-88 (1st Cir.2011) (describing defendant’s argument that SawS-top’s technology was not viable). Indeed, the fact that the conspiracy did not include every player in the table-saw industry implies that the conspirators were concerned with major manufacturers taking a license, *432 not smaller ones. Thus, the defendants’ post-2004 actions — which, in any event, are not fully discussed in the complaint— are not much help in evaluating the manufacturers’ potential motives.
Even if the “who, what, where, when, and why” were not enough, the complaint also describes a number of communications among the defendants. Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire. See, e.g., Evergreen Partnering Grp., Inc., 720 F.3d at 49; Hyland, 771 F.3d at 320; Mayor & City Council of Balt., 709 F.3d at 136. Here, in addition to discussing the October 2001 meeting where the alleged conspiracy formed, the complaint describes phone calls, meetings, and discussions among the various conspirators. Such “allegation[s] identify] a practice, not illegal in itself, that facilitates [an antitrust conspiracy] that would be difficult for the authorities to detect.” Text Messaging, 630 F.3d at 628; accord Todd v. Exxon Corp., 275 F.3d 191, 213 (2d Cir.2001); see also Sharon E. Foster, LIBOR Manipulation and Antitrust Allegations, 11 De-Paul Bus. & Com. L.J. 291, 304 (2013) (“Facilitating practices ... may evidence the plus factors necessary to establish the inference of an agreement.”).
A market in which sales power is concentrated in the hands of the few can also facilitate coercion. See, e.g., Evergreen Partnering Grp., 720 F.3d at 48; Todd, 275 F.3d at 208; In re High Fructose Com Syrup Antitrust Litig., 295 F.3d 651, 656 (7th Cir.2002). Fewer “minds” must “meet” in a concentrated market. And the complaint implies that the table-saw market is so concentrated, as the defendants here purportedly control 85% of that market. J.A. 81 ¶¶44, 48; see, e.g., Starr, 592 F.3d at 323 (listing the defendants’ control of 80% of the market as a relevant plus factor). Further, the complaint describes ways in which the manufacturers attempted to hide their actions, including a mutual agreement not to “leave a paper trail.” See J.A. 93-94 ¶¶ 92-97. These alleged attempts by the manufacturers to hide their actions could suggest that the defendants knew their actions “would attract antitrust scrutiny,” Starr, 592 F.3d at 324; in other words, the alleged facts suggest consciousness of guilt. Those actions give us further reason to conclude that a group boycott is plausibly alleged.[2]
D.
Generally, “[i]n addition to establishing a conspiracy, a successful plaintiff must also show ... that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market.” Terry’s Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 611 n. 10 (4th Cir.1985). In a viable complaint, “the plaintiff must allege, not only an injury to himself, but an injury to the market as well.” Agnew v. Nat’l Collegiate Ath. Ass’n, 683 F.3d 328, 335 (7th Cir.2012); accord Todd, 275 F.3d at 213. “Actual anticompetitive effects include, but are not limited to, reduction of output, increase in *433 price, or deterioration in quality.” Jacobs v. Tempur-Pedic Int’l, Inc., 626 F.3d 1327, 1339 (11th Cir.2010).
In cases involving “per se” violations of the Sherman Act, however, this anti-competitive harm is essentially presumed. “[C]ertain agreements or practices” have such a “pernicious effect on competition” that they “are conclusively-presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm” that they caused. TFWS, Inc. v. Schaefer, 242 F.3d 198, 209 (4th Cir.2001). Claims that such agreements “lacked anticompetitive effects ... are simply irrelevant.” In re Cardizem CD Antitrust Litig., 332 F.3d 896, 909 (6th Cir.2003).
Although the manufacturers contend that SawStop failed to allege anticompetitive. harm, SawStop maintains that its alleged group boycott violates the Sherman Act per se — such that no separate allegations of harm were necessary. “[I]n some circumstances a group boycott may be considered a per se violation.” Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 617 n. 4 (4th Cir.1991). And the alleged agreement here comes close to the “paradigmatic boycott,” in which “a group of competitors” (here, the manufacturers) take “collective action” (here, the refusal to license or implement) that “may inhibit the competitive vitality of rivals” • (here, SawStop). NYNEX Corp., 525 U.S. at 135, 119 S.Ct. 493; see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (explaining that per se illegal boycotts “often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete and frequently the boycotting firms possessed a dominant position in the relevant market”).
Despite the facial appeal of SawStop’s per se argument, neither the manufacturer’s brief nor the district court’s opinion directly address it. The district court remarked only in passing that SawStop had “fail[ed] to establish a naked boycott organized for a concerted refusal to deal.” SD3, LLC, 2014 WL 3500674, at *5. It did not discuss the issue further, and offered only a cursory citation to Northwest Wholesale. The manufacturers similarly assert, without explanation, that SawStop “failed to allege any per se violation of the Sherman Act.” Response Br. 58.
Because the issue of competitive harm is inadequately briefed, and because the district court’s opinion likewise gives us no guidance, we cannot decide that issue or affirm on that basis. If the manufacturers so choose, however, they may again raise the issue of competitive harm before the district court on remand so that it may fully consider and discuss the question with the benefit of proper argument.
E.
In sum, SawStop’s complaint is very different from the one seen in Twombly, which rested solely on “descriptions of parallel conduct and not on any independent allegation of actual agreement.” Twombly, 550 U.S. at 564, 127 S.Ct. 1955; see also id. at 548, 127 S.Ct. 1955 (“[T]he question ... is whether a § 1 complaint can survive when it alleges ... certain parallel conduct ..., absent some factual context suggesting agreement[.]” (emphasis added)). SawStop’s complaint alleges an actual agreement to boycott in detail and does not rely, as in Twombly, on parallel conduct alone. The dissent’s observation to the contrary is, respectfully, simply an inaccurate reading of Twombly. See Dissenting Op. 446. In particular, the Supreme Court directly rejected the dissent’s reading of the Twombly complaint: “Al *434 though in form a few stray statements sp[oke] directly of agreement, on fair reading these [were] merely legal conclusions resting on the prior allegations.” Twombly, 550 U.S. at 564, 127 S.Ct. 1955. The Supreme Court was explicit in finding that the Twombly complaint did not contain “any independent allegation of actual agreement among the ILECs.” Id.
As to the district court, it erred by applying a summary-judgment standard to SawStop’s group boycott claim and by confusing “plausibility” with “probability.” Again, because the complaint pleads parallel conduct in conjunction with “circumstanced pointing toward a meeting of the minds,” Twombly, 550 U.S. at 557, 127 S.Ct. 1955, SawStop has adequately alleged the agreement needed to support a Sherman Act § 1 conspiracy. Of course, it remains to be seen whether SawStop has also adequately alleged any requisite harm to the market.
Our decision should not be mistaken for an endorsement of the ultimate merits of SawStop’s case. At this point, SawStop’s prospects for success are largely irrelevant, as “[a] lawsuit need not be meritorious to proceed past the motion-to-dismiss stage.” Ringgold-Lockhart v. Cnty. of Los Angeles, 761 F.3d 1057, 1066 (9th Cir.2014). In fact, “a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.” Twombly, 550 U.S. at 556, 127 S.Ct. 1955; accord Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 89 (1st Cir.2015); N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 125 (2d Cir.2013); cf. Iqbal, 556 U.S. at 681, 129 S.Ct. 1937 (“[W]e do not reject these bald allegations on the ground that they are unrealistic or nonsensical.”). To dismiss SawStop’s complaint because of some initial skepticism would be to mistakenly “collapse discovery, summary judgment^] and trial into the pleading stages of a case.” PetroHunt, L.L.C. v. United States, 90 Fed.Cl. 51, 71 (2009).
Our decision also is not meant to afford SawStop a license for unlimited discovery. Like the dissent, we are well aware of the substantial cost that discovery in an antitrust case can impose, Twombly, 550 U.S. at 558-59, 127 S.Ct. 1955, and recognize that the cost largely falls on the defendants. When not appropriately managed, that cost can have an extortionate effect, compelling some defendants to enter early settlements even in meritless suits. But we are neither the Advisory Committee on the Rules of Civil Procedure, nor the Supreme Court, nor Congress. We must take the rules as we find them.
District courts possess a number of tools — including limitations on discovery or consideration of a timely motion for summary judgment — to combat any sort of predatory discovery. See Federal Judicial Center, Manual for Complex Litigation § 30.1 (4th ed. 2004) (“Effective management of antitrust litigation requires identifying, clarifying, and narrowing pivotal factual and legal issues as soon as praeti-cable[.]”). Although tools like these do not permit us to give the benefit of the doubt to groundless claims, Twombly, 550 U.S. at 559, 127 S.Ct. 1955, they confirm that our antitrust jurisprudence cannot be driven solely by fears about the expense of modern antitrust litigation. We have faith that district courts possess both the will and the ability to make good use of available case-management mechanisms, employing them as needed to preserve a level playing field — particularly in antitrust *435 cases.[3]
VI. Standard-Setting Conspiracies
In addition to its group-boycott claim, SawStop alleges two separate but related conspiracies concerning private standard-setting — the standard-rejection conspiracy and the contrived-standards conspiracy. Industry participants allegedly used their influence over UL to prevent the private organization from adopting AIMT as a required safety device. The defendants then purportedly encouraged UL to adopt other standards that imposed needless costs on SawStop and insulated the defendants from liability.
We find that the complaint does not plausibly establish either conspiracy. Although the standard-rejection and contrived-standards conspiracies are separately alleged, they fail for the same fundamental reason: the facts alleged imply nothing beyond ordinary participation in lawful standard-setting processes. Thus, in contrast to its group-boycott claim, SawStop’s standards-focused conspiracies fail to allege the “more” necessary to raise an inference-of agreement.
A.
Standard-setting organizations are voluntary membership organizations whose participants develop “technical specifications to ensure that products from different manufacturers are compatible with each other,” address certain threshold safety concerns, or serve other beneficial functions. Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 875 (9th Cir.2012). These organizations have enjoyed a rather complicated relationship with antitrust law. “[Mjembers of such associations often have economic incentives to restrain competition and [ ] the product standards set by such associations have a serious potential for anticompetitive harm.” Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); see also Soc’y of Mech. Eng’rs v. Hydrolevel Corp., 456 U.S. 556, 571, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). As a result, “private standard-setting associations have traditionally been objects of antitrust scrutiny.” Allied Tube, 486 U.S. at 500, 108 S.Ct. 1931.
Still, such ventures can also have “decidedly procompetitive effects” by encouraging “greater product interoperability,” generating “network effects,” and building “incentives to innovate.” Princo Corp. v. Int’l Trade Comm’n, 616 F.3d 1318, 1335 (Fed.Cir.2010); accord Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 400 (2d Cir.2014); Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir.2007). “As a result, one can hardly infer anticompetitive intent to exclude from rule making alone[.] ... Antitrust must therefore seek out the exceptional case, where rule making is used to facilitate collusion or the exclusion of rivals whose competitiveness or innovation threatens the relevant decision makers.” Areeda & Hovenkamp, supra, § 22.06b.
Courts have found standard-setting organizations and their members to have violated the antitrust laws in some cases, but those cases are relatively few and far between. Of most relevance here, “an entity may be prosecuted for an antitrust violation on the basis of improper *436 coercion of a standards-setting body.” Coalition for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 506 (9th Cir.2010). Allied Tube is the oft-cited example of that concept. In that case, the defendant deliberately packed a standard-setting panel with paid supporters who then banned a competing product. Allied Tube, 486 U.S. at 496, 108 S.Ct. 1931. Coalition for ICANN Transparency is another example. There, the Ninth Circuit found potential antitrust liability when a powerful corporation allegedly used vexatious litigation and financial pressure to coerce a standards organization into providing advantages to that defendant. Coalition for ICANN Transparency, 611 F.3d at 501, 506.
The common thread in the few cases finding liability in the private standard-setting context is unique, external pressure applied to achieve an anti-competitive end. “[T]he principal concern has been the use of standards setting as a predatory device ...; normally there is a showing that the standard was deliberately distorted by competitors of the injured party, sometimes through lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosure.” DM Research, Inc. v. Coll,. of Am. Pathologists, 170 F.3d 53, 57-58 (1st Cir.1999). In other words, a plaintiff must ordinarily show that the standard-setting activity had a market-closing effect that was committed.“through the use of unfair, or improper practices or procedures.” Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 488 (1st Cir.1988) (Breyer, J.).
In the usual ease, neither the standard-setting organization nor its participants will run afoul of antitrust law when they use ordinary processes to adopt unexceptional standards. It is “axiomatic that a standard setting organization must exclude some products, and such exclusions are not themselves antitrust violations.” Golden Bridge Tech., Inc. v. Motorola, Inc., 547 F.3d 266, 273 (5th Cir.2008); see also Gtr. Rockford Energy & Tech. Corp., 998 F.2d at 396 (“The failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1.”); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 801 F.Supp.2d 1163, 1193 (D.N.M.2011) (holding that the plaintiff did not plausibly allege an antitrust conspiracy based on the defendant’s mere opposition to a particular standard). “To hold otherwise would stifle the beneficial functions of such organizations!.]” Golden Bridge Tech., 547 F.3d at 273. Similarly, it is' not problematic, standing alone, for market participants to try to influence the standard-setting process through the organization’s ordinary procedures. See Clamp-All Corp., 851 F.2d at 488.
B.
SawStop never alleges that UL’s normal procedures were thwarted, or that the defendants engaged in some form of external misconduct. Instead, it asks us to infer malfeasance because some of the defendants’ representative served on the relevant standard-setting panel. But SawStop provides no authority drawing that sort of naked inference, and we have found none. “Certifiers may reasonably believe that they can do their job properly (a job that benefits consumers) only if all interested parties are allowed to present proposals, frankly present their views, and vote.” Id.
SawStop’s complaint takes issue with UL’s actions largely because the organization is alleged to have erred in rejecting SawStop’s proposed standard and selecting another one. The unstated assumption of this argument is that, lacking a valid “tech *437 nical” justification, the only remaining explanation must be an antirust conspiracy.
Even if UL’s ultimate decision can be called “wrong,” that mistake alone does not indicate concerted action to manipulate the result. “[S]tandard-setting bodies sometimes err,” but simple error creates no reason for liability without some further indication that the organization’s activities are “merely a ploy to obscure a conspiracy against competing producers.” Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 294 (5th Cir.1988); see also DM Research, 170 F.3d at 57 (“Merely to say that the standards are disputable or have some market effects has not generally been enough to condemn them as ‘unreasonable’ under the Sherman Act.”); Moore v. Boating Indus. Ass’ns, 819 F.2d 693, 711-13 (7th Cir.1987) (finding no evidence of an actionable conspiracy despite the jury’s finding that the association was “unreasonable and arbitrary” in setting standards); cf. Brookins v. Int’l Motor Contest Ass’n, 219 F.3d 849, 854 (8th Cir.2000) (“So long as IMCA made game-defining rules decisions based upon its purposes as a sports organization, an antitrust court need not be concerned with the rationality or fairness of those decisions.”); M & H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973, 984 (1st Cir.1984) (“We discern no duty to provide an absolutely objective or scientific basis for decision.”). “[Antitrust is not concerned with whether a standard might be unreasonable as an abstract proposition.” Areeda & Hovenkamp, supra, § 22.06c.
If antitrust suits were permitted to go forward based solely on an allegation that the standard-setting body erred, courts would be cast into the role of standard-setting appellate bodies. Consol. Metal Prods., 846 F.2d at 297. Any disagreement big or small with the ultimate adoption of a safety standard would, to follow SawStop’s reasoning, create potential antitrust liability. “Not only would this tax the abilities of the federal courts, but fear of treble damages and judicial second-guessing would discourage the establishment of useful industry standards.” Id.
Beyond its error-based allegations, the complaint’s only assertions of concerted action are conclusory and non-specific: “a collective decision was made,” or the defendants “agreed to vote as a bloc,” or non-SawStop designs were a “smokescreen.” J.A. 96-97 ¶¶ 103, 105, 109. The complaint identifies no fact other than consistent votes against SawStop’s proposal (and for the other designs) to establish the alleged illegal agreements. That would be parallel conduct, but such conduct is equally consistent with legal behavior. After all, even if SawStop is right that technical reasons did not support the standard-setting organizations decisions, other non-anticompetitive explanations remain. See, e.g., Golden Bridge Tech., 547 F.3d at 272-73 (“[T]he existence of an independent financial motive to [change the standard] might be an independent reason for each Appellee company to support [the change].”); Advanced Tech. Corp., Inc. v. Instron, Inc., 925 F.Supp.2d 170, 179 (D.Mass.2013) (dismissing a complaint where “[t]he crux of [the plaintiffs] antitrust claim [wa]s simply that competitors in a market declined to support a standard that would promote another competitor’s technology”).
Lastly, we note that SawStop does not allege the sort of anticompetitive objectives that are ordinarily seen in standard-setting cases. Usually, standard-setting cases are brought when products are effectively excluded from the market by adopted safety standards. Here, SawStop largely complains that it could not use the standard-setting process to impose its own product on everyone else. The anticom- *438 petitive harms of a “refusal to impose” are much harder to identify. Nothing that UL or the standards-setting groups did barred SawStop’s AIMT-equipped saws from the market, as SawStop’s entry into the competitive table-saw market establishes. From all appearances, SawStop remains free to offer its saws with the UL seal of approval, along with its perceived market advantage of also offering AIMT on those' saws. And if UL’s newer standards generate some additional costs, those costs are common to each member of the industry who chooses to make a UL-compliant table saw. We see nothing anticompetitive or exclusionary in that.
The district court thus did not err in granting the defendants’ motions to dismiss on the standard-setting claims.
VII.
For the reasons described above, the district court correctly dismissed the standard-setting claims as to all the defendants. The district court also correctly dismissed the group-boycott claims against Hitachi Koki Co., Ltd.; Makita Corporation; Chang Type Industrial Co., Ltd.; OWT Industries, Inc.; Pentair Water Group, Inc.; Stanley Black & Decker, Inc.; Delta Power Equipment, Inc.; Techtronic Industries North America, Inc.; and Tech-tronic Industries Co., Ltd. However, the district court erred in dismissing the group-boycott claims against the remaining defendants.
Therefore, the district court’s decision dismissing SawStop’s complaint is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION

. We have omitted any internal quotation marks, alterations, emphasis, or citations here and throughout this opinion, unless otherwise noted.

. SawStop also argued that the complaint alleged sufficient direct evidence of a conspiracy to avoid dismissal. See Robertson, 679 F.3d at 289 (holding that a complaint can state a § 1 claim if it alleges "direct evidence” of the agreement itself); but see Am. Chiropractic Ass’n v. Trigon Healthcare, Inc., 367 F.3d 212, 226 (4th Cir.2004) (indicating that "smoking gun” direct evidence is "extremely rare in antitrust cases”). As SawS-top’s complaint meets “Twombly’s requirements with respect to allegations of illegal parallel conduct,” Robertson, 679 F.3d at 290, we need not determine whether SawStop has adequately alleged direct evidence.

. Many of the same allegations that carry SawStop's complaint past a motion to dismiss — the “who, what, when, and where” — • may substantially focus the discovery in a way that was not possible in Twombly. See id. at 560 n. 6, 127 S.Ct. 1955 (noting the difficulty and expense of discovery directed toward “some illegal agreement” "between unspecific persons” "at some point over seven years.”).