**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2317**

SD3 II LLC, a Delaware limited liability company,

Plaintiff – Appellant,

v.

BLACK & DECKER (U.S.) INCORPORATED; BLACK & DECKER
CORPORATION; MILWAUKEE ELECTRIC TOOL CORPORATION; ONE
WORLD TECHNOLOGIES, INCORPORATED; ROBERT BOSCH TOOL
CORPORATION; RYOBI TECHNOLOGIES, INCORPORATED,

Defendants – Appellees,

and

DEWALT INDUSTRIAL TOOLS; EMERSON ELECTRIC COMPANY;
HITACHI KOKI USA LTD.; PENTAIR CORPORATION; PORTER-CABLE
CORPORATION; SKIL POWER TOOLS; PENTAIR WATER GROUP,
INCORPORATED; PENTAIR, INCORPORATED; CHANG TYPE
INDUSTRIAL CO., LTD.; DELTA POWER EQUIPMENT CORPORATION;
HITACHI KOKI CO., LTD.; MAKITA CORPORATION; MAKITA USA,
INCORPORATED; OWT INDUSTRIES, INCORPORATED; ROBERT BOSCH
GMBH; STANLEY BLACK & DECKER, INCORPORATED; TECHTRONICS
INDUSTRIES CO., LTD.; TECHTRONIC INDUSTRIES NORTH AMERICA,
INCORPORATED; EMERSON ELECTRIC COMPANY,

Defendants.

**No. 16-2354**

SD3 II, LLC, a Delaware limited liability company,

                Plaintiff – Appellee,

      v.

BLACK & DECKER (U.S.) INCORPORATED; BLACK & DECKER CORPORATION; MILWAUKEE ELECTRIC TOOL CORPORATION; ONE WORLD TECHNOLOGIES, INCORPORATED; RYOBI TECHNOLOGIES, INCORPORATED; ROBERT BOSCH TOOL CORPORATION,

                Defendants – Appellants,

      and

CHANG TYPE INDUSTRIAL CO., LTD.; DELTA POWER EQUIPMENT CORPORATION; DEWALT INDUSTRIAL TOOLS; EMERSON ELECTRIC COMPANY; HITACHI KOKI CO., LTD.; HITACHI KOKI USA LTD.; MAKITA CORPORATION; MAKITA USA, INCORPORATED; OWT INDUSTRIES, INCORPORATED; PENTAIR CORPORATION; PORTER-CABLE CORPORATION; ROBERT BOSCH GMBH; SKIL POWER TOOLS; STANLEY BLACK & DECKER, INCORPORATED; TECHTRONICS INDUSTRIES CO., LTD.; TECHTRONIC INDUSTRIES NORTH AMERICA, INCORPORATED; PENTAIR WATER GROUP, INCORPORATED; EMERSON ELECTRIC COMPANY; PENTAIR, INCORPORATED,

                Defendants.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:14-cv-00191-CMH-IDD)

Argued: January 23, 2018             Decided:  April 19, 2018

Before WILKINSON, AGEE, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion in which Judge Wilkinson and Judge Wynn concurred. Judge Wynn wrote a separate concurring opinion.

---

**ARGUED:** Derek L. Shaffer, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellants/Cross-Appellees. John David Harkrider, AXINN, VELTROP & HARKRIDER LLP, New York, New York, for Appellees/Cross-Appellants. **ON BRIEF:** Paul F. Brinkman, Ethan C. Glass, Jonathan G. Cooper, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellants/Cross-Appellees. Jonathan S. Franklin, David M. Foster, Washington, D.C., Layne E. Kruse, Eliot Fielding Turner, NORTON ROSE FULBRIGHT US LLP, Houston, Texas, for Appellee/Cross-Appellant Robert Bosch Tool Corporation. Richard B. Dagen, Washington, D.C., John M. Tanski, AXINN, VELTROP & HARKRIDER LLP, Hartford, Connecticut, for Appellees/Cross-Appellants Black & Decker (U.S.) Inc. and The Black and Decker Corporation. Scott W. Hansen, Laura A. Brenner, James N. Law, REINHART, BOERNER VAN DUREN S.C., Milwaukee, Wisconsin; James G. Kress, Paul C. Cuomo, BAKER BOTTS LLP, Washington, D.C., for Appellees/Cross-Appellants.

---

AGEE, Circuit Judge:

In February 2014, SD3, LLC, and its subsidiary, SawStop LLC (collectively, "SawStop"), filed an antitrust suit against a group of Table Saw Manufacturers.[1] SawStop alleged that the Table Saw Manufacturers had colluded in contravention of antitrust laws to exclude its proprietary technology from the market. The acts and economic harm upon which SawStop's claims are based occurred by 2002. Under the general rules for claims accrual and limitations, SawStop's antitrust claims expired four years later, in 2006. *See* 15 U.S.C. § 15b (establishing a four-year limitations period for antitrust claims); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("Generally, [an antitrust] cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business.").

Nevertheless, SawStop contended that its suit was timely under the equitable doctrine of fraudulent concealment. That doctrine is "read into every federal statute of limitation[s]" and, in cases where the harm is concealed from the plaintiff, starts the limitations period "when the wrong [i]s discovered." *GO Comput., Inc. v. Microsoft*

[1] The Table Saw Manufacturers are Black & Decker (U.S.), Inc. and Black & Decker Corp. (collectively, "Black & Decker"); Robert Bosch Tool Corp. ("Bosch"); and Milwaukee Electric Tool Corp.; One World Technologies, Inc.; and Ryobi Technologies, Inc. (collectively, "Ryobi").

SawStop initially asserted its antitrust claims against "nearly two dozen saw manufacturers and affiliated entities." *See SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 418 (4th Cir. 2015). The district court dismissed SawStop's complaint as to each of those nearly two dozen entities, and, in an earlier appeal, we affirmed that determination in large part. *Id.* at 438. Only SawStop's claim against the Table Saw Manufacturers survived on remand, and only that claim is at issue in this appeal.

*Corp.*, 508 F.3d 170, 177–78 (4th Cir. 2007) (internal quotation marks omitted). According to SawStop, the earliest it could have discovered the Table Saw Manufacturers' collusion was February 2010, thereby making its 2014 suit timely.

The district court disagreed and granted summary judgment to the Table Saw Manufacturers based on the bar of the statute of limitations. The district court found that SawStop knew sufficient facts to identify its injury, as well as the identities of those who had injured it, in 2002. On appeal, SawStop asks us to revive its claim. Like the district court, though, we conclude that SawStop's suit was untimely because SawStop was on actual notice of its claim by, at latest, 2003. Accordingly, the statute of limitations expired no later than 2007.[2] We therefore affirm the judgment of the district court.

## I.

## A.

Because this appeal follows the district court's grant of the Table Saw Manufacturers' motion for summary judgment, we recount the facts below in the light most favorable to SawStop, the non-moving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004) (observing that on a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party"). For purposes of our factual recitation, we assume familiarity with the background set out in our prior

---

[2] The Table Saw Manufacturers filed a cross appeal concerning the privilege applicable to certain emails between SawStop and its attorneys. In view of our affirmance of the district court's judgment, we dismiss the Table Saw Manufacturers' cross appeal as moot.

opinion, *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412 (4th Cir. 2015), and recount below a subset of those facts which are relevant to the issues on appeal.

1.

Dr. Stephen Gass, a patent lawyer by trade, invented Active Injury Mitigation Technology ("AIMT") in 1999, and formed SawStop the next year to market AIMT to the table saw industry, including the Table Saw Manufacturers.

Shortly after SawStop debuted AIMT in August 2000, it began licensing discussions with each of the Table Saw Manufacturers, or their predecessors. By mid-2001, each of the Table Saw Manufacturers had expressed interest in licensing AIMT for use on some of their saws. By January 2002, SawStop and Ryobi had entered into a preliminary licensing agreement to allow Ryobi's use of AIMT on some of its table saws. Similar licensing agreements between SawStop and Black & Decker or SawStop and Bosch were in process. Despite these initial signs of success, SawStop's negotiations with each Table Saw Manufacturer quickly collapsed. By June 2002, each Table Saw Manufacturer had walked away from the negotiating table, some for seemingly inconsequential reasons.

2.

Despite early, promising negotiations, SawStop's relationship with the Table Saw Manufacturers soon became adversarial. For example, in October 2000, a Black & Decker official warned Dr. Gass that, if SawStop went to the U.S. Consumer Product Safety Commission—a government agency that acts as an industry-wide, standard-setting body—in an effort to mandate AIMT's inclusion on all table saws, the "industry would

6

get together and squish" SawStop. J.A. 729. In November 2000, Dr. Gass demonstrated AIMT at a trade show at which the Table Saw Manufacturers were in attendance. Immediately following the demonstration, representatives from each of the Table Saw Manufacturers left the room for a private meeting. Dr. Gass later characterized the event by representing that the Table Saw Manufacturers' representatives "all got up and *went in the other room to collude*." J.A. 2159 (emphasis added).

Dr. Gass and SawStop's vice president, David Fanning, who is also a patent attorney, encountered further hostility, or alleged collusion, toward AIMT in February 2001. While attending a meeting of the Defense Research Institute, they witnessed a presentation given by a Black & Decker representative, Daniel Lanier, which focused on "evidentiary issues raised by SawStop." J.A. 2209. Lanier "spoke about how products liability plaintiff's lawyers might try to get evidence of SawStop in and how defense lawyers might try [to] keep evidence of SawStop out in products liability cases." J.A. 2210. According to Fanning, the "takeaway from . . . Lanier's presentation was that if none of the manufacturers adopt something like [AIMT], then . . . [the industry could] argue that [AIMT] or something like it is not viable and [could] use as evidence the fact that nobody's adopted it." J.A. 2210. In Fanning's words, Lanier "clearly . . . communicated" in early 2001 that the industry should boycott AIMT. J.A. 2211.

And indeed, SawStop's interactions with the Table Saw Manufacturers presaged a more formal industry-wide agreement to work against AIMT. This agreement was the product of a meeting between the Table Saw Manufacturers from which SawStop was

7

excluded and the particulars of which SawStop learned only through discovery in this case. The meeting was conducted under the auspices of the Power Tool Institute ("PTI," or the "Institute"), a lobbying organization that the Table Saw Manufacturers controlled in substantial part. Following a group vote at the Institute's 2001 annual meeting, PTI's membership agreed to pool their test data and to work together to create a finger-sensing technology to rival AIMT.

About two years later, an Institute-backed group, which included the Table Saw Manufacturers, made a public announcement of that technology plan. On December 1, 2003, the Antitrust Division of the Department of Justice (sometimes, "DOJ") published a "Notice Pursuant to the National Cooperative Research and Production Act of 1993," 15 U.S.C. §§ 4301–4306, which alerted the public and the market to a "Power Tool Institute Joint Venture Project" (the "PTI joint venture"). J.A. 187. *See generally* 68 Fed. Reg. 67,216 (Dec. 1, 2003). The DOJ notice stated that the Table Saw Manufacturers, with others, planned to enter into a PTI-sponsored joint venture, "[t]he nature and objectives of [which were] the research and development of technology for power saw blade contact injury avoidance, including skin sensing systems, blade braking systems, and/or blade guarding systems." J.A. 187. The notice went on to say the members of the PTI joint venture would "share confidential information and intellectual property rights" with each other, and that any resulting intellectual property would "be shared among" the PTI joint venture participants and the Institute's membership generally. J.A. 187.

SawStop was contemporaneously aware of this development, but did nothing. Fanning "read the Federal Register notice in 2003" and "had a suspicion that something

8

might be going on." J.A. 3829 (internal quotation marks omitted). Even so, SawStop never reported its belief of anticompetitive behavior by the Table Saw Manufacturers to the applicable regulatory authorities, like the DOJ or the Federal Trade Commission ("FTC").

3.

Throughout this period, SawStop's principals suspected a conspiracy and repeatedly represented, both privately and publicly, that the Table Saw Manufacturers were colluding against it. In 2004, for instance, Dr. Gass gave an interview to the Portland, Oregon, newspaper *The Oregonian* for an article concerning SawStop and AIMT. In that article, Dr. Gass made explicit reference to industry-wide collusion, claiming "saw makers [we]re colluding to suppress" AIMT. J.A. 877. According to Dr. Gass, the industry had two motives for such collusion. First, "they don't want to retrofit production lines." J.A. 877. Second, and "[m]ore important, . . . they want to avoid the product[s] liability claims that could result because they failed to adopt a technology that could have prevented hand injuries." J.A. 877.

Dr. Gass made similar statements as an expert witness in a products liability suit against Bosch. *See generally Kent v. Robert Bosch Tool Corp.*, No. 1:06-cv-11555-RWZ (D. Mass. filed Aug. 30, 2006). There, Dr. Gass offered his opinion that AIMT was a feasible improvement that Bosch could have implemented to make its table saws safer. At his deposition, taken in September 2008, Dr. Gass testified that AIMT had not been widely adopted by the table saw industry because he "believe[d] it to be true" that the Table Saw Manufacturers were "colluding against SawStop" and AIMT. J.A. 909.

9

Indeed, even before Dr. Gass' 2008 *Kent* deposition, he sought legal advice to determine what recourse, antitrust or otherwise, SawStop had against the Table Saw Manufacturers for their alleged collusion. In 2006, Dr. Gass consulted what is now the law firm of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") to evaluate whether SawStop had an antitrust claim against the Table Saw Manufacturers and, if so, to consider whether Quinn Emanuel would take SawStop's case on a contingency-fee basis.

In a November 2006 letter, Quinn Emanuel declined SawStop's request for contingency-fee-based representation, but indicated that SawStop "may well [have] a good claim" against the Table Saw Manufacturers. J.A. 3653. The letter went on to discuss areas of practical concern, which caused Quinn Emanuel to decline contingency-fee representation at that time. Among Quinn Emanuel's concerns were "*potential statute of limitations problems*[.]" J.A. 3653 (emphasis added).

4.

Despite Quinn Emanuel's explicit warning regarding "potential statute of limitations problems," SawStop neither brought suit against the Table Saw Manufacturers nor contacted the DOJ or the FTC to lodge an antitrust complaint. Instead, SawStop continued to prosecute its collusion case in the court of public opinion. In that regard, Dr. Gass continued to testify as an expert witness in products liability cases against the Table Saw Manufacturers alleging collusion against SawStop.

The plaintiffs in several of the cases in which Dr. Gass testified on their behalf as an expert witness pled specific claims of collusion by the Table Saw Manufacturers. *See,*

10

*e.g.*, *Eddery v. Black & Decker Corp.*, No. 1:08-cv-10849-LTS (D. Mass. filed May 23, 2008). For example, paragraph 3 of the nine-page *Eddery* complaint alleges that Black & Decker "colluded with [its] competitors and others in the industry to keep [certain] alternatives," like AIMT, "off the market." Complaint ¶ 3, *Eddery*, No. 1:08-cv-10849-LTS. However, Dr. Gass represented that he never read the pertinent allegations in the complaint and never inquired of the plaintiff's counsel concerning those allegations despite testifying to that precise subject matter. Similarly, Fanning used the Public Access to Court Electronic Records (PACER) system to review the dockets of several products liability suits for evidence of the Table Saw Manufacturers' collusion. *See, e.g.*, *Eddery*, No. 1:08-cv-10849-LTS; *Kent*, No. 1:06-cv-11555-RWZ. But Fanning also denies that he read the portion of the *Eddery* complaint—or any other complaint for that matter—that alleged collusion.

SawStop represents that it found its long-sought evidence of collusion on February 25, 2010, when Dr. Gass and Fanning were attending the trial in *Osorio v. One World Technologies, Inc.*, No. 1:06-cv-10725-NMG (D. Mass. filed Apr. 24, 2006). Dr. Gass was scheduled to testify in that case as an expert witness on the collusion of the Table Saw Manufacturers against AIMT. On that day, David Peot, an engineer formerly employed by Ryobi, testified that the industry had colluded against SawStop by a secret group vote held during the Institute's 2001 annual meeting—a meeting from which SawStop was excluded from attending.

B.

Nearly four years to the day after Peot's testimony, on February 20, 2014, SawStop filed its original complaint, since amended, against the Table Saw Manufacturers in the United States District Court for the Eastern District of Virginia. SawStop brought three claims under the Sherman Antitrust Act, 15 U.S.C. §§ 1–38, including that the Table Saw Manufacturers and others had conspired to boycott AIMT and exclude it from the market (the "group boycott claim"). SawStop also alleged two "standard-setting conspiracies": (1) that the Table Saw Manufacturers and other members of the PTI had unfairly corrupted industry-wide safety standards set by Underwriters Laboratories and the Consumer Product Safety Commission "to prevent AIMT from becoming a standard of the table saw industry," and (2) that the Table Saw Manufacturers, again acting through the Institute, "engaged in a concerted corruption of U[nderwriters] L[aboratories] safety standards for table saw blade guards to implement a design standard rather than a performance standard." J.A. 134–35.

1.

The district court initially dismissed SawStop's complaint in its entirety under Rule 12(b)(6), holding that SawStop had failed to allege sufficient facts to support any of its claims. SawStop appealed that ruling, and we affirmed the judgment of the district court in part and reversed in part. *See generally SD3*, 801 F.3d 412.

We affirmed the district court's dismissal of each claim as to a host of then-defendant corporations involved in the table saw industry and concluded that SawStop had failed to tie those defendants to any conspiracy. Further, we held that SawStop had

12

"trie[d] to tie other defendants to the purported conspiracies with nothing more than conclusory statements." *Id.* at 423. In addition, we found "that the complaint d[id] not plausibly establish either [standard-setting] conspiracy" because "the facts alleged impl[ied] nothing beyond ordinary participation in lawful standard-setting processes." *Id.* at 435.

We reversed the district court's judgment on the limited issue of the dismissal of SawStop's group boycott claim as alleged against the Table Saw Manufacturers. We held that "SawStop [had] adequately alleged parallel conduct" sufficient to support an antitrust claim and that it had "buil[t] a detailed story" concerning the Table Saw Manufacturers' alleged collusion, including "the particular time, place, and manner in which the boycott initially formed." *Id.* at 427, 430. Noting Peot's 2010 testimony, we observed that the complaint "describ[ed] a separate meeting held for th[e] purpose [of staging the boycott] during the Power Tool Institute's October 2001 annual meeting," "name[d] at least six specific individuals who took part in forming the boycott," and "t[old] us the means by which the defendants sealed their boycott agreement: a majority vote." *Id.* at 430. We also noted that SawStop's claim was bolstered by the Table Saw Manufacturers' common motive—insulating themselves from liability in products liability cases—and their control of the table saw market. *Id.* at 431–32.

Accordingly, we remanded the case only on the group boycott claim against the Table Saw Manufacturers.

2.

Upon remand, at the conclusion of discovery, the Table Saw Manufacturers moved for summary judgment on the basis that SawStop's claim was barred by the relevant four-year statute of limitations. The Table Saw Manufacturers contended that SawStop's claim was filed nearly a decade late, as SawStop had been injured in 2002 when all licensing negotiations for AIMT ended. As a result, the Table Saw Manufacturers maintained that the four-year statute of limitations applicable to SawStop's antitrust claim, 15 U.S.C. § 15b, expired in 2006.

In response, SawStop agreed that it had been injured in 2002, but contended that the Table Saw Manufacturers had fraudulently concealed their group boycott and, as a result, the limitations period was tolled until SawStop either had actual knowledge of its injury or had implied knowledge of its injury and failed to perform a reasonable investigation. SawStop argued that it could not have known about the Table Saw Manufacturers' boycott prior to Peot's 2010 testimony in the *Osorio* case. Under SawStop's theory, the 2014 complaint was timely.

The district court agreed with the Table Saw Manufacturers that the statute of limitations governing SawStop's group boycott claim had expired and granted the Table Saw Manufacturers' motion for summary judgment. *See SD3, LLC v. Black & Decker (U.S.), Inc.*, 215 F. Supp. 3d 486 (E.D. Va. 2016). In so doing, the district court applied the three-part test for fraudulent concealment, under which the plaintiff must prove that "(1) the party pleading the statute of limitations fraudulently concealed facts which are the basis of a claim, and that (2) the [plaintiff] failed to discover those facts within the

statutory period, despite (3) the exercise of due diligence." *GO Comput.*, 508 F.3d at 178 (alterations & internal quotation marks omitted). The district court concluded that SawStop was on actual notice of its antitrust claim no later than June 2002. Alternatively, the court found that even if SawStop did not have actual notice, it was on inquiry notice of its claim by June 2002 and had failed to undertake a reasonable investigation.

Accordingly, the district court entered judgment in favor of the Table Saw Manufacturers. SawStop[3] timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

This appeal follows the district court's grant of a motion for summary judgment. We review issues raised by such a motion *de novo*, applying "the same legal standards as the district court." *Lawson v. Union Cty. Clerk of Ct.*, 828 F.3d 239, 247 (4th Cir. 2016) (internal quotation marks omitted). Summary judgment is appropriate if "the movant"— here, the Table Saw Manufacturers—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of this appeal, we view the facts, and draw all reasonable inferences arising therefrom, in favor of SawStop. *Williams*, 372 F.3d at 667.

---

[3] In the course of this appeal SD3, LLC, sold SawStop, LLC, to a third party. As part of that transaction, the antitrust claims of SD3, LLC, and SawStop, LLC, were transferred to a new entity, also controlled by Dr. Gass: SD3 II, LLC. SD3, LLC, and SawStop, LLC, have moved to substitute SD3 II, LLC, in their place. We grant that motion. However, for ease of understanding, we continue to refer to the plaintiff-appellant as "SawStop."

# III.

SawStop contends that the district court erred in concluding that its claim was time-barred by the statute of limitations. Significantly, SawStop does not challenge the district court's conclusion that its group boycott claim accrued in 2002, and, by implication, that the limitations period governing that claim would have expired in 2006. Rather, SawStop seeks to avoid the generally applicable limitations period by arguing that the Table Saw Manufacturers fraudulently concealed their boycott, of which its principals, Dr. Gass and Fanning, contend they first learned about in 2010 through Peot's *Osorio* testimony.

"Fraudulent concealment is an equitable doctrine read into every federal statute of limitation." *Go Comput.*, 508 F.3d at 177–78 (alteration & internal quotation marks omitted). "It does not stop the clock [for limitations purposes]; it moves the clock, starting it from when the wrong was discovered rather than when it was committed." *Id.* at 178. To prove fraudulent concealment, SawStop must show (1) fraud by the Table Saw Manufacturers, (2) a lack of actual notice by SawStop of its claim, and (3) either a lack of inquiry notice or, in the event it was on inquiry notice, that it exercised reasonable diligence in investigating the claim. *See id.* A failure to prove any one of these three elements is fatal to SawStop's fraudulent concealment argument.

Like the district court, we conclude that the doctrine of fraudulent concealment has no application here. We need not discuss each aspect of SawStop's fraudulent concealment argument to reject it. In particular, we need not, and thus do not, determine whether the Table Saw Manufacturers defrauded SawStop for the purpose of hiding an

16

alleged boycott. Even if we assume that such fraud occurred, we reject SawStop's fraudulent concealment argument through application of the notice and diligence elements. In short, SawStop was on both actual and inquiry notice of its claim well before Peot's 2010 testimony. And, once on notice of its claim, SawStop failed to act with reasonable diligence.

A.

We first conclude that fraudulent concealment does not save SawStop's claim because SawStop's principals were on actual notice of the Table Saw Manufacturers' alleged boycott by, at latest, December 2003. Thus, the statute of limitations expired no later than 2007—nearly seven years before SawStop filed its complaint.

Actual notice is a straightforward concept to which we have long applied the standard that the plaintiff knew the "'fraudulently concealed facts, which are the basis of a claim.'" *Go Comput.*, 508 F.3d at 178 (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987))*; accord Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (holding that to prove fraudulent concealment the plaintiff must demonstrate that the defendant "fraudulently concealed *facts that are the basis of the plaintiff's claim*" (emphasis added)). Thus, a plaintiff is on actual notice if it has "sufficient facts to identify a particular cause of action." *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). Mere "hints, suspicions, hunches or rumors" are not enough to put a plaintiff on actual notice. *Hobson*, 737 F.2d at 35. Instead, the

17

plaintiff must be able to plead the factual allegations necessary to withstand a motion to dismiss, including "both the injury that g[ave] rise to [its] claim and the injurer." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010). Where an antitrust injury is involved, that means that the plaintiff must know that it has suffered an injury resulting from the parallel conduct of a group in suspicious circumstances, such as when the group has a motive to collude. *See SD3*, 801 F.3d at 424 ("For a § 1 claim to survive, then, a plaintiff must plead parallel conduct *and* something more." (internal quotation marks omitted)); *see also Pocahontas Supreme Coal Co.*, 828 F.2d at 218 (addressing the plaintiffs' knowledge with respect to "the defendants' specific activities undertaken pursuant to the conspiracy").

SawStop's contentions focus on its purported inability to ascertain the Table Saw Manufacturers' concerted activity until Dr. Gass and Fanning heard Peot testify. In particular, SawStop argues that it "did not know enough facts to state an objectively valid claim—that is, enough to plead a claim that would withstand a motion to dismiss" until that time. Appellants' Br. 51. SawStop admits that it had "suspicions" the Table Saw Manufacturers were colluding prior to 2010, but maintains that those suspicions do not amount to actual notice. Appellants' Br. 52. In support of its claimed inability to plead an actionable antitrust claim in the absence of Peot's testimony, SawStop points to this Court's opinion from the prior appeal. There, SawStop says, we characterized Peot's testimony as the "heart" of SawStop's case and "just barely" enough to survive a motion to dismiss. *See* Appellants' Br. 26 (citing *SD3*, 801 F.3d at 429–30).

18

SawStop misreads our prior opinion. To be blunt, it confuses the significance of that opinion, which was decided only on the basis of the allegations in the complaint, with the wholly different substantive and procedural context following a motion for summary judgment on a fully-developed record. In doing so, SawStop fails to grasp the distinction between mere allegations reviewed upon a motion to dismiss and the application of evidence to those allegations upon a motion for summary judgment. Neither the statute of limitations, the elements of fraudulent concealment, or an evidentiary record were before the Court in the prior appeal. As discussed below, by June 2002—the date the Table Saw Manufacturers broke off licensing negotiations with SawStop for AIMT—and certainly no later than December 2003, the record shows that SawStop had sufficient information for Rule 12(b)(6) purposes to plead and identify its antitrust injury, the scope of that injury, and the parties responsible for causing it.

### 1.

SawStop should have been on actual notice of its antitrust claim as of June 2002, when each of the Table Saw Manufacturers ended licensing negotiations for AIMT in rapid succession and under circumstances SawStop has previously labeled as "pretextual." J.A. 122; *see also SD3*, 801 F.3d at 420. By that point in time, SawStop's principals had "sufficient facts to identify [SawStop's] cause of action" against the Table Saw Manufacturers, *Hobson*, 737 F.2d at 35, because Dr. Gass and Fanning knew the Table Saw Manufacturers had a motive to collude and had in fact acted in parallel. SawStop obviously knew its injurer: the Table Saw Manufacturers.

19

Dr. Gass and Fanning learned of the Table Saw Manufacturers' collusion bit-by-bit over a three-year period. For example, in 2000, Dr. Gass knew that the Table Saw Manufacturers were hostile to AIMT. In particular, he was alerted that "the industry would get together and squish SawStop" if it did not negotiate with the industry on terms favorable to the Table Saw Manufacturers. *SD3*, 215 F. Supp. 3d. at 496. And by November of that year, Dr. Gass had "observed [the Table Saw Manufacturers] leave a presentation to meet separately and, in his words 'collude.'" *Id.*

Further suspicions of collusion were confirmed in 2001, when Dr. Gass and Fanning attended a Defense Research Institute presentation where they learned that the Table Saw Manufacturers had the motive to collude. Lanier, a Black & Decker employee, gave a presentation concerning the best way that players in the table saw industry could defend against products liability suits in which SawStop's AIMT was alleged to be a safer, feasible alternative technology. After watching Lanier's presentation, Fanning concluded "that [the Table Saw Manufacturers] *were motivated to conspire* [against SawStop] to avoid products liability risk." *Id.* (emphasis added).

And by 2002, SawStop also saw the Table Saw Manufacturers acting in parallel—the hallmark of a conspiracy—when they rapidly and in succession ended licensing negotiations for AIMT. SawStop's principals knew that Ryobi had reneged on a signed license agreement with no explanation. It also knew that its licensing negotiations with Bosch collapsed at about the same time Ryobi went silent, as did its licensing negotiations with Black & Decker despite Black & Decker having "said licensing was inevitable." *Id.*

20

Thus, by 2002, SawStop knew its injurers and the extent of its economic injury in the form of lost sales and royalties. SawStop also knew the "type" of its injury: antitrust collusion. Based on this information, SawStop was on actual knowledge of its group boycott claim by June 2002 because it had sufficient information to state a claim for which relief could be granted. *See Go Comput.*, 508 F.3d at 178.

2.

Nonetheless, even if we assume that by 2002 SawStop lacked the facts to identify both its injury and injurer, the PTI joint venture's publication in the December 2003 Federal Register confirmed that the Table Saw Manufacturers were collectively using the PTI joint venture as a mechanism to exclude SawStop's AIMT from the market. Far from being a mere "hint[], suspicion[], hunch[] or rumor[]," *Hobson*, 737 F.2d at 35, that publication was concrete evidence that the Table Saw Manufacturers were working together for the very purpose that SawStop now claims is anticompetitive.

The 2003 Federal Register publication—which was clearly marked as coming from the "DEPARTMENT OF JUSTICE Antitrust Division," J.A. 187—served two important functions. First, it introduced new information pertinent to SawStop's group boycott claim to the public and the marketplace. Second, it provided context to SawStop's failed licensing negotiations with each of the Table Saw Manufacturers.

The 2003 Federal Register publication made public for the first time that the Table Saw Manufacturers were part of the PTI joint venture. It further provided clear notice that the Table Saw Manufacturers, through the PTI joint venture, were working to develop "technology for power saw blade contact injury avoidance, including skin sensing

21

systems, blade braking systems, and/or blade guarding systems." J.A. 187. This is the very product that SawStop had been marketing as AIMT and trying to sell to the Table Saw Manufacturers. Finally, the 2003 Federal Register publication divulged information concerning the members of the PTI joint venture and their intent to "share confidential information and intellectual property rights to achieve the goals of the joint venture," including any "intellectual property that is contributed" and "any intellectual property or technology that is developed through the joint venture." J.A. 187. Thus, the 2003 Federal Register publication also put SawStop's attorney-principals on actual notice that the Table Saw Manufacturers were working together to exclude AIMT from the market.

What's more, the 2003 Federal Register publication placed in context the significance of the Table Saw Manufacturers' abruptly-concluded licensing negotiations for AIMT. It came less than eighteen months after the licensing negotiations foundered and on the heels of statements by Dr. Gass in which he maintained that the Table Saw Manufacturers had colluded against SawStop. Given Dr. Gass and Fanning's knowledge concerning the Table Saw Manufacturers' motive to collude, the 2003 Federal Register publication establishes that SawStop's principals knew the Table Saw Manufacturers' decision to end licensing negotiations was an anticompetitive one and that they had evidence of it.

The statements of Dr. Gass, SawStop's attorney-principal, confirm that he understood that the 2003 Federal Register publication, and the other actions noted since 2000, represented an antitrust conspiracy. Shortly after its publication, Dr. Gass made numerous public and private statements in which he directly accused the Table Saw

Manufacturers of collusion. For example, in 2004, Dr. Gass gave an interview to *The Oregonian*, in which he stated that the industry was colluding to boycott AIMT. In 2006, he sought out Quinn Emanuel in hopes that the firm would represent SawStop in an antitrust suit against the Table Saw Manufacturers. And in 2008, Dr. Gass testified in depositions that AIMT had not been widely accepted by the table saw industry because of the Table Saw Manufacturers' collusive efforts to exclude the technology. Indeed, Dr. Gass opined that collusion was a "*straightforward conclusion* from the fact that [AIMT] was available and [the Table Saw Manufacturers] chose not to [license] it" but rather to "form[] a consortium to develop an alternative to already existing technology." J.A. 909 (emphasis added).

3.

SawStop offers little to rebut the foregoing analysis and the record. Instead, it relies heavily on the language used in our prior opinion, where we found that SawStop's group boycott claim was sufficient to survive a motion to dismiss under the standard set out by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). But we did not address any statute of limitations argument because none was before us. Now, SawStop argues that if we were to conclude that the statute of limitations bars its claim, it would create a "perverse Catch-22" for similarly-situated plaintiffs. Appellants' Br. 51. According to SawStop, under the district court's ruling, an antitrust plaintiff "must either sue before knowing facts sufficient to state a valid claim (resulting in dismissal), or else wait to amass facts sufficient to state a

23

valid claim, only to be barred by the statute of limitations (again resulting in dismissal)." Appellants' Br. 51. We disagree.

"Actual notice" means notice of sufficient facts, "which are the basis of a claim," *Go Comput.*, 508 F.3d at 178, including identification of the injury, the injurer, and the type of injury. It does not require awareness of sufficient facts to allow a plaintiff to litigate its case to a jury without discovery. As we observed in *GO Computer*, there is no legal basis to "graft[] [the] novel requirement [that the full contours of the cause of action concealed by the alleged fraud be discoverable outside of discovery] on the traditional equitable terms of fraudulent concealment." 508 F.3d at 179; *accord Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993) ("Commencement of a limitations period need not . . . await the dawn of complete awareness."). Rather, it is sufficient that SawStop's principals knew enough factual information from which they could plead their cause of action for Rule 12(b)(6) purposes: the nature and scope of SawStop's injury and the identity of those who had injured it.

SawStop cannot obfuscate our prior opinion and the reliance on Peot's testimony to now argue that it lacked actual notice. To be sure, the case presented by SawStop in its complaint shows that Peot's testimony was the first time SawStop learned certain specific information about the Table Saw Manufacturers' alleged collusion. But that fact has no legal significance in the case now before us as this appeal arises in a different context, on a different issue, with a different standard of review, and with an actual evidentiary record. On that record, SawStop could have pled the factual allegations necessary to withstand a motion to dismiss by 2003, at the latest.

24

SawStop wants us to hew closely to the "facts" that it alleged in its complaint, including the centrality of Peot's testimony, to evaluate its response to the Table Saw Manufacturers' motion for summary judgment. In effect, SawStop wants motion-to-dismiss treatment on a motion for summary judgment. However, the Federal Rules of Civil Procedure require a more extensive inquiry. In the current posture of SawStop's case—having participated fully in discovery—we are obliged to examine the full record, not simply what SawStop chose to allege as fact in its complaint. And the facts revealed during discovery confirm that SawStop was on actual knowledge of its antitrust claim no later than 2003.

SawStop also claims that some of the information it had prior to 2003 is insufficient as a matter of law to give rise to actual notice because it related only to one of the Table Saw Manufacturers, not all three. For example, SawStop argues that the lessons Dr. Gass and Fanning learned from Lanier's 2001 presentation were meaningless for purposes of its antitrust claim because Lanier represented only the views of Black & Decker, not necessarily all the Table Saw Manufacturers. But that argument lacks merit. Irrespective of what lessons SawStop took from Lanier's presentation, the 2003 Federal Register publication irrefutably demonstrates that the Table Saw Manufacturers were working together—*i.e.*, colluding—to compete with AIMT by that time. And Dr. Gass' own statements, in 2004, 2006, and 2008, demonstrate his knowledge of that joint collusion.

****

25

In sum, we find that SawStop was on actual notice of its antitrust claim against the Table Saw Manufacturers by at least 2003. Once SawStop's attorney-principals became aware of the 2003 Federal Register publication they knew that SawStop had been injured by the Table Saw Manufacturers. They knew that the Table Saw Manufacturers had a pre-existing motive to collude against SawStop, as evidenced by SawStop's interactions with various industry executives—most especially Lanier's 2001 presentation. And they knew that the Table Saw Manufacturers were working together to create a skin-sensing product that would compete directly with AIMT. Moreover, Dr. Gass' behavior between 2004 and 2008 confirms SawStop's actual prior knowledge of its antitrust claim.

Thus, for all the foregoing reasons we hold the district court did not err in finding that SawStop had the required actual notice of its antitrust claim.

### B.

In any event, even if SawStop lacked actual notice of its antitrust claim, we alternatively conclude that SawStop was on inquiry notice of that claim and that SawStop failed to investigate its claim with the necessary diligence.

Inquiry notice for purposes of a fraudulent concealment claim "charges a person to investigate when the information at hand would have prompted a reasonable person to do so." *GO Comput.*, 508 F.3d at 178. However, inquiry notice does not require full knowledge of the underlying claim as a condition precedent of the duty to investigate. *Id.* Rather, "[w]here a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." *Id.* at 179. Put

another way, if the plaintiff (1) believes he might have been harmed and (2) knows who is responsible for that harm, then he is on inquiry notice to act.

*GO Computer* illustrates this rule. In that case, GO Computer was on inquiry notice of an antitrust claim against Microsoft to recover for harm caused by Microsoft's predatory licensing practices. *See id.* at 172–73, 179. *See generally Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). This was so for a number of reasons, including the direct involvement of GO Computer's principal in the Government's investigation of Microsoft, as well as his acknowledgment that third-party hardware manufacturers "had told him about Microsoft's restrictive licensing practices." *See GO Comput.*, 508 F.3d at 178–79.

Once on inquiry notice, the plaintiff must take reasonable steps to discover the information necessary to establish actual notice. *See id.* That investigation need not be "ceaseless . . . when reasonable inquiry does not expose grounds for suit." *Id.* at 179. Even so, the plaintiff cannot simply ignore the diligence requirement and later claim that the alleged fraud was "well-disguised." *Id.*

As it argued in the district court, SawStop posits that it was not on inquiry notice until Dr. Gass and Fanning heard Peot testify in 2010. SawStop contends that before 2010 it "was aware only of isolated facts that sufficed to raise suspicions, but not to spur a reasonably diligent plaintiff to investigate." Appellants' Br. 57. Under its theory of the case, SawStop further contends that, even if it was on inquiry notice before 2010, the Table Saw Manufacturers cannot show that any additional investigation on its part would have uncovered sufficient facts to give rise to actual notice. Lastly, SawStop represents

that, even if the Court were to assume that it was on inquiry notice, the Table Saw Manufacturers are not entitled to summary judgment by virtue of the diligence requirement because they, like the district court, were unable to identify a significant fact that SawStop would have discovered if it had taken additional investigative steps.

Again, we disagree with SawStop. As to inquiry notice, SawStop had sufficient information to spur a reasonable person to investigate its claims, at the very latest, by December 2003. Moreover, SawStop did not engage in a reasonable investigation. In particular, despite SawStop's knowledge of the 2003 Federal Register publication, SawStop never alerted the DOJ or FTC about its suspicion that the Table Saw Manufacturers were engaged in anticompetitive behavior.

1.

To begin, SawStop was on inquiry notice for the same reasons that we conclude above put it on actual notice. By at least 2003, SawStop's principals knew that the Table Saw Manufacturers were working together as part of the PTI joint venture. They knew that from 2000 to 2002, several of the Table Saw Manufacturers had threatened SawStop or had participated in conferences for the purpose of facilitating a boycott of AIMT. Finally, SawStop's principals knew that each of the Table Saw Manufacturers had walked away from licensing negotiations with SawStop by June 2002 for pretextual reasons.

The evidence of inquiry notice is even stronger here, as evidenced by Dr. Gass' actions between 2004 and 2008. In 2004, Dr. Gass gave an interview, in which he stated that the Table Saw Manufacturers had conspired to exclude AIMT from the market.

28

Then, in 2006, Dr. Gass sought out Quinn Emanuel to represent SawStop in a putative antitrust suit against the Table Saw Manufacturers. Finally, in 2008, Dr. Gass testified that he believed that the PTI joint venture was a collusive effort by the Table Saw Manufacturers to exclude AIMT from the market. The pleadings in the suits in which Dr. Gass testified, which also were reviewed by Fanning, contained specific allegations of collusion by the Table Saw Manufacturers—the very same collusion, in fact, that resulted in their claimed boycott of AIMT and SawStop.

Under these circumstances, it is untenable for SawStop to claim it lacked inquiry notice of its group boycott claim until February 2010 when at the same time its principals continued to accuse the Table Saw Manufacturers of collusion. Thus we conclude that SawStop was on inquiry notice no later than December 2003.

2.

Because SawStop was on inquiry notice, it was required to reasonably investigate its claim. SawStop failed to do so.

For example, SawStop failed to take the most basic investigative step—contacting the DOJ or FTC about what it knew of the Table Saw Manufacturers' collusive actions. The DOJ's Antitrust Division published the 2003 Federal Register notice so as to "permit[] private parties to inform the antitrust agencies of any behavior thought to be unlawful or harmful to their interests." H.R. Rep. No. 98-1044, at 16 (1984) (Conf. Rep.). But despite this purpose, and the potential negative effects the PTI joint venture would have on its business, SawStop never alerted any governmental organization tasked with

29

overseeing the PTI joint venture to its knowledge of the Table Saw Manufacturers' actions.

SawStop's inaction dooms its case. As outlined above, SawStop's principals possessed hard evidence that the Table Saw Manufacturers, as part of the PTI joint venture, were working on a product designed to compete with AIMT in furtherance of an ongoing collusive course of action. And given the opportunity to report the PTI joint venture to the DOJ or FTC, the principals of SawStop engaged in what amounted to a public-relations campaign. Dr. Gass accused the Table Saw Manufacturers of colluding against the company in the news media. He also sought to make his case against the Table Saw Manufacturers, including testifying that they were colluding against SawStop, as an expert in products liability suits. SawStop tried to draw public attention to its alleged harm, but failed to take the most obvious step to do so. *GO Comput.*, 508 F.3d at 179 ("[N]othing in [our precedent] excuses a negligent plaintiff from the diligence requirement[.]"). With its home on fire, SawStop shrieked, but declined to call the fire department.

Because SawStop's investigative efforts were woefully inadequate in the face of the 2003 Federal Register publication and prior evidence, the Table Saw Manufacturers do not need to point out any additional information that SawStop could have found.

**\*\*\*\***

Accordingly, as a matter of law, SawStop cannot prevail on its claim of fraudulent concealment. Thus, we hold that the district court did not err in granting summary judgment to the Table Saw Manufacturers under the statute of limitations because

30

SawStop was on actual notice and inquiry notice and failed to act with the requisite diligence.

## IV.

SawStop should have filed its complaint against the Table Saw Manufacturers no later than 2007. Its complaint filed in 2014 is thus barred by the statute of limitations. Therefore, the judgment of the district court is

*AFFIRMED.*

WYNN, Circuit Judge, concurring:

I concur fully in the majority opinion. In particular, I agree with the majority opinion's conclusion that SawStop had actual notice of its antitrust claim as of June 2002, and therefore that SawStop is not entitled to relief from the limitations period based on the doctrine of fraudulent concealment. And I agree with the majority opinion that SawStop was on actual notice as of June 2002 because, by that time, it was aware of sufficient facts to plead an antitrust conspiracy claim that would survive a motion to dismiss—namely, (1) an economic injury, (2) parallel conduct, and (3) "something 'more.' " *Ante* at 19–21. I write separately to briefly summarize the state of the law in this circuit regarding when a plaintiff is on "actual notice" and therefore unable to avail itself from relief from the governing limitations period based on fraudulent concealment.

For more than 40 years, this Court has been unwavering in our articulation of what actual notice requires: awareness of sufficient facts to state a claim. *See Go Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007) (explaining that antitrust plaintiff may not invoke fraudulent concealment if he has discovered "facts which are the basis of a claim"); *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) ("facts that are the basis of the plaintiff's claim"); *Pocahontas Supreme Coal Co. v. Bethlehem Steel*, 828 F.2d 211, 218 (4th Cir. 1987) ("facts which are the basis of a claim"); *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 574 (4th Cir. 1976) ("facts which are the basis of his cause of action").

It is axiomatic that the "facts which are the basis of a claim" or "cause of action" are those which enable a party to bring a valid suit. *See* Cause of Action, *Black's Law*

*Dictionary* (10th ed. 2014) ("A group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to *obtain a remedy in court from another person*." (emphasis added)). Thus, as the majority opinion correctly explains, for a plaintiff to be on actual notice, it "must be able to plead the factual allegations necessary to withstand a motion to dismiss." *Ante* at 18.

This rule is consistent with the approach taken by our sister circuits. *See, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010) ("A defendant who prevents a plaintiff from obtaining information that he needs *in order to be able to file a complaint that will withstand dismissal* is forbidden . . . to plead the statute of limitations for the period in which the inquiry was thwarted." (emphasis added)); *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988) (holding that actual notice requires "knowledge [that] would . . . justify the filing of a complaint"); *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984) (holding that actual notice requires "awareness of sufficient facts to identify a particular cause of action" and "to file suit"), *overruled in part on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

And this long-standing and widely embraced rule—that a plaintiff is on actual notice *only* when it is aware of sufficient facts to state a claim that withstands a motion to dismiss—balances the interests served by the fraudulent concealment doctrine: obliging plaintiffs to file suit in a timely fashion once they are aware, or should be aware, of facts sufficient to state a claim that can withstand a motion to dismiss, while preventing wrongdoers from avoiding liability by concealing their wrongdoing. *See Marlinton*, 71

33

F.3d at 122 ("The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from concealing a fraud, or . . . committing a fraud in a manner that concealed itself until the defendant could plead the statute of limitations to protect it." (internal quotation marks omitted)). To that end, any rule that would treat a plaintiff as being on actual notice under a standard more favorable to defendants—in situations when the plaintiff lacks knowledges of sufficient facts to state a claim that would withstand dismissal—would wrongly "creat[e] the anomalous situation of *requiring persons to file suit on a hunch*, only to be dismissed for failure to state a claim." *Hobson*, 737 F.2d at 39 (emphasis added). As the majority opinion correctly states, "[m]ere 'hints, suspicions, hunches or rumors' are not enough to put a plaintiff on actual notice." *Ante* at 17 (quoting *Hobson*, 737 F.2d at 35). Accordingly, a plaintiff is on actual notice when it knows of "enough factual information from which [it] could plead [its] cause of action for Rule 12(b)(6) purposes." *Id.* at 24.

Applying that standard, I agree with the majority opinion that, as of June 2002, SawStop was aware of sufficient facts to state an antitrust conspiracy claim that would withstand dismissal, and therefore was on actual notice.